PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.                                                      No. 05-4214

LARRY JO LEESON,
          *Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of West Virginia, at Clarksburg.
Irene M. Keeley, Chief District Judge.
(CR-03-43)

Argued: March 17, 2006

Decided: July 19, 2006

Before GREGORY and DUNCAN, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Senior Judge Hamilton wrote the
opinion, in which Judge Gregory and Judge Duncan joined.

---

## COUNSEL

**ARGUED:** L. Richard Walker, Assistant Federal Public Defender,
OFFICE OF THE FEDERAL PUBLIC DEFENDER, Clarksburg,
West Virginia, for Appellant. Zelda Elizabeth Wesley, Assistant
United States Attorney, OFFICE OF THE UNITED STATES
ATTORNEY, Clarksburg, West Virginia, for Appellee. **ON BRIEF:**
Thomas E. Johnston, United States Attorney, Clarksburg, West Vir-
ginia, for Appellee.

**OPINION**

HAMILTON, Senior Circuit Judge:

Larry Leeson (Leeson) appeals his conviction and sentence on one count of being a felon in possession of a firearm, 18 U.S.C. §§ 922(g)(1), 924(a)(2). For reasons that follow, we affirm.

I.

On August 6, 2003, Leeson, of Nutter Fort, West Virginia, presented himself at the Veteran's Administration (V.A.) hospital in Pittsburgh, Pennsylvania. Following interaction with Leeson, the admissions desk clerk at the hospital reported to hospital security that a man, later identified as Leeson, was acting strangely in that he had used three different surnames in an attempt to obtain medical treatment or medication. The admissions desk clerk also reported that the man had a bulge in his coat which might be a gun.

Two uniformed police officers of the V.A. arrived on the scene to investigate. The first officer approached Leeson while the other hung back as back-up. After observing some sort of badge on Leeson's belt, the first officer asked Leeson if he was a police officer. Leeson falsely identified himself as Larry McDonald and falsely claimed to be an agent of the Federal Bureau of Investigation (FBI). The first officer then asked Leeson whether he had a weapon, to which question Leeson replied: "of course I have a weapon." (J.A. 283).

The two officers then requested Leeson to accompany them to the police station at the V.A. hospital in order to secure Leeson's weapon in accordance with V.A. policy. Once at the police station, Leeson surrendered his weapon, which was a .357 caliber revolver. Because the officers thought Leeson's FBI badge looked suspicious, a supervising officer contacted the FBI to verify Leeson's story. In the meantime, Leeson was allowed to return to his vehicle in the parking lot with his firearm in order to retrieve photographic identification. Once in his vehicle, Leeson fled the scene at a high rate of speed.

About the same time, the officers learned Leeson's true identity and home address and contacted the Nutter Fort Police Department

about the situation, including that Leeson was carrying a firearm. The Nutter Fort Police Department contacted Sergeant Jeff McAtee (Sergeant McAtee) of the Harrison County Sheriff's Department, who was familiar with Leeson and the fact that Leeson was not an FBI agent, but a convicted felon who cannot lawfully possess a firearm.

Officers of several law enforcement agencies joined in pursuit of Leeson, who led them on a dangerous high speed chase on U.S. Interstate 79 using evasive driving maneuvers. Following Leeson's crossing into West Virginia, his vehicle began to smoke. At such time, Leeson took an exit off the interstate, brought his vehicle to a sudden stop on the exit, opened the door, and exited the vehicle. Sergeant McAtee observed the .357 caliber revolver in a holster on Leeson's belt as Leeson exited his vehicle. Because Leeson refused to put his hands on his vehicle as ordered, the officers grabbed Leeson's arms and handcuffed him. While being handcuffed, Leeson told Sergeant McAtee and the other officer handcuffing him, "[E]asy, I could have made this bad for you." (J.A. 235). The propriety of the district court's admission of this statement at trial in the face of Leeson's objection based upon Federal Rule of Evidence 403 is one of the issues on appeal.

On September 4, 2003, a federal grand jury sitting in the Northern District of West Virginia indicted Leeson on one count of being a convicted felon in possession of a firearm. 18 U.S.C. §§ 922(g)(1), 924(a)(2). Following Leeson's arraignment, he was remanded to custody to await his trial. Leeson then filed a notice of insanity defense and moved for a psychiatric examination.[1]

---

[1]Title 18, United States Code § 17 sets forth the federal standard for an insanity defense:

> (a)   Affirmative defense.—It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

> (b)   Burden of proof.—The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

18 U.S.C. § 17.

Leeson's motion for a psychiatric examination was granted by a United States Magistrate Judge and, as a consequence, Leeson was transported to the Metropolitan Correctional Center (MCC Chicago), Federal Bureau of Prisons, Chicago, Illinois, for psychiatric examination.

Once at MCC Chicago, Dr. Jason Dana (Dr. Dana), holder of a doctorate in clinical psychology, examined and evaluated Leeson's mental health. On April 6, 2004, Dr. Dana prepared a forensic psychological report detailing his findings and diagnosis regarding Leeson. With regard to Leeson's sanity at the time of the instant offense, Dr. Dana's report opined: "there is no indication that he was suffering from any form of cognitive impairment or mental illness impacting his ability to understand the nature and quality, or wrongfulness of his actions at the time of the instant offense." (J.A. 867). Rather, Dr. Dana's report diagnosed Leeson as being a malingerer and of having opiate dependence by history.[2]

Leeson's trial commenced on September 16, 2004, wherein he continued to assert an insanity defense. Leeson called Dr. Jonathan Himmelhoch (Dr. Himmelhoch), a psychiatrist, to render an expert opinion in support of his insanity defense. The district court ruled that Dr. Himmelhoch was qualified to render such an expert opinion. At trial, Dr. Himmelhoch testified that he diagnosed Leeson with Post Traumatic Stress Disorder, partial lobe epilepsy, depression, and migraine headaches. He then testified that, on the day of Leeson's charged offense, August 6, 2003, these illnesses worked together to make Leeson severely mentally ill such that Leeson did not understand the nature and quality or the wrongfulness of his conduct.

The government called Dr. Dana in rebuttal. The district court ruled that Dr. Dana was qualified to render an expert opinion regarding the presence or absence of severe mental illness or defect in connection with Leeson's insanity defense. Consistent with his expert witness report, Dr. Dana testified at trial that, in his opinion, Leeson was not suffering from any form of cognitive impairment or mental

---

[2]At trial, Dr. Dana testified that "malingering is specifically the reporting of symptoms of mental illness for the purposes of obtaining a secondary gain." (J.A. 544).

illness which impacted his ability to understand the nature and quality of or the wrongfulness of his actions on August 6, 2003. Also consistent with his expert witness report, Dr. Dana testified that his diagnostic workup of Leeson indicated malingering and opiate dependence. At issue on appeal is the following portion of Dr. Dana's direct testimony at trial in rebuttal to Leeson's offered testimony of Dr. Himmelhoch:

Q. Now regarding your—your diagnosis of malingering, what specific action or criteria did you utilize in reaching that conclusion?

A. Going through the different information that he provided to me, cross-referencing it with records and other information that was available to me in order to identify the validity of the claims, the assessment of malingering, it was done with the services that we mentioned before and behavioral observations, providing him with opportunities to speak to other members of the psychology services department. Generally the more times a person is asked to explain their problems and concerns, the more opportunity they have to be inconsistent, so it gets into all of those things.

Q. And you said, of course, he was observed in the—in the department?

A. Yes.

Q. And so you relied upon information from other members, of course?

A. Not only other members of the department but information regarding observed behaviors from people who were not in our department as well.

Q. Give us some examples of information that you utilized that came from people not within the department but still up there at the BOP Institution in Chicago.

A.   The Correctional Officers that are responsible for supervising the units, oftentimes when they see information that is not in the realm of mainstream, not what is usually identified, they will leave messages for us, contact us of course personally about information.

Q.   What about other inmates, do you ever receive information from other inmates or people incarcerated at the BOP?

A.   Yeah. Occasionally. Though you have to be careful about that information but in this case there were two separate inmates during the time that Mr. Leeson was there that approached the other forensic psychologist. They did not talk to me directly.

MR. WALKER [(counsel for Leeson)]:   Your Honor, I object to this. I think this is inappropriate and it is not something that is considered a basis for his medical or psychological evaluation and it's hearsay.

THE COURT:   Overruled.

MR. WALKER:   I'd like to cross-examine those individuals.

THE COURT:   I said overruled.

A.   It is actually a standard in order to gather information about a person from sources and information. Again, you have to weigh the validity of all circumstances. In a situation where this was the only piece of information that I had, [I] would not generally rely on it. In situations where it's one of several pieces of information, it then becomes more reliable.

Q.   And, of course, you're speaking of the information provided by the inmates at the institution?

A.   Yes.

Q.  And—and what information did they provide? You said there were two separate ones.

A.  Yeah. They—they essentially indicated that Mr. Leeson had approached them to recruit them in assisting him in looking crazy while he was on the unit.

Q.  I—I'm sorry?

A.  And, that—that—that he had approached them and asked them to assist him in looking crazy on the unit. And one—one of the inmates said that he was asked by Mr. Leeson to go to the officer and tell him that an inmate in the back was acting crazy.

(J.A. 545-47). On appeal, Leeson contends the district court abused its discretion in allowing Dr. Dana to testify regarding the statements of Leeson's fellow inmates at MCC Chicago.

On September 22, 2004, the jury rejected Leeson's insanity defense and convicted him on the single count of being a felon in possession of a firearm. At sentencing, the district court determined that Leeson had three predicate convictions for violent felonies, which qualified him to be sentenced under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e). They are: (1) a 1988 conviction in Texas state court for burglary of a habitation with the intent to commit theft; (2) a 1984 conviction in Texas state court for aggravated robbery; and (3) a 1984 conviction in Texas state court for attempted capital murder of a peace officer. Leeson does not dispute the facts underlying these predicate convictions as set forth in his presentence report (the PSR). However, Leeson objected to below and asserts as error on appeal the district court's treatment of his prior conviction for aggravated robbery and his prior conviction for attempted capital murder of a peace officer as two separate offenses that were "committed on occasions different from one another," 18 U.S.C. § 924(e)(1). According to Leeson, these last two offenses were part of a single criminal episode, such that they cannot be counted as separate predicate offenses for purposes of sentencing him under the ACCA.

The district court ultimately sentenced Leeson to 230 months' imprisonment. This timely appeal followed.

II.

As his first assignment of error, Leeson contends the district abused its discretion in admitting, over his contemporaneous objection, the testimony of Sergeant McAtee that, as he was handcuffing Leeson, Leeson stated: "[E]asy, I could have made this bad for you." (J.A. 235). Leeson argues the statement had minimal probative value regarding his state of mind, which value was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). According to Leeson, admission of the statement created the substantial risk that the jury would punish him for his harsh words and bad character, rather than make an objective determination of his guilt as to the offense charged in the indictment.

Leeson's assignment of error with regard to the challenged statement is without merit. Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence . . . more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed. R. Evid. 403. We review a district court's ruling on the admissibility of evidence for abuse of discretion. *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997).

As Leeson himself concedes, his statement while being handcuffed by law enforcement officers is relevant to a critical element of the government's case. Specifically, the statement is relevant to establishing that Leeson voluntarily and intentionally possessed the firearm charged in his indictment. *United States v. Hobbs*, 136 F.3d 384, 390 (4th Cir. 1998) ("To show a § 922(g)(1) violation, the government must prove three elements: (i) that the defendant was a convicted felon at the time of the offense; (ii) that he voluntarily and intentionally possessed a firearm; and (iii) that the firearm traveled in interstate commerce at some point."). Moreover, Leeson himself made the "vol-

untarily and intentionally" element of his felon-in-possession charge even more of an issue by asserting an insanity defense. Finally, the statement itself is only mildly menacing. Given the highly probative value of the challenged statement and its only mildly menacing nature, we cannot reasonably conclude that its probative value was substantially outweighed by the danger of unfair prejudice. Accordingly, we hold the district court did not abuse its discretion in overruling Leeson's objection to the challenged statement.

### III.

Leeson's second assignment of error pertains to Dr. Dana's testimony to the effect that, in forming his expert opinion that Leeson did not suffer from a severe mental illness which prevented him from appreciating the nature and quality or the wrongfulness of possessing a firearm as a convicted felon on August 6, 2003, he (Dr. Dana) relied, *inter alia*, upon statements by two different prison inmates that Leeson "had approached them to recruit them in assisting him in looking crazy while he was on the unit," and upon a statement by one of those inmates that "he was asked by Mr. Leeson to go to the officer and tell him that an inmate in the back was acting crazy." (J.A. 547). According to Leeson, the district court abused its discretion in admitting this testimony because it was hearsay, *see* Fed. R. Evid. 801, which did not otherwise qualify for admission under Federal Rule of Evidence 703 (Rule 703).

Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

Leeson argues that the challenged testimony did not qualify for admission under Rule 703 for three reasons. First, he claims that Dr. Dana did not sufficiently establish that inmates in a federal mental health facility, in general, are reasonably relied upon by experts in his field. Second, he claims that Dr. Dana was not in a position to determine whether the two fellow inmates were trustworthy sources of information, and therefore, Dr. Dana could not have reasonably relied upon their statements. Finally, he claims the district court failed to make a finding that the probative value of the inmates' statements substantially outweighed their prejudicial effect.

As previously stated, we review a district court's ruling on the admissibility of evidence for abuse of discretion. *Brooks*, 111 F.3d at 371. Here, we hold the district court did not abuse its discretion in admitting Dr. Dana's testimony regarding the inmates' out-of-court statements.

Assuming *arguendo* the challenged testimony constitutes hearsay as defined by Federal Rule of Evidence 801,[3] we hold the challenged testimony otherwise qualifies for admission under Rule 703. First, contrary to Leeson's position, during Dr. Dana's testimony, Dr. Dana sufficiently established that inmates in a federal mental health facility, in general, are reasonably relied upon by experts in his field. Critically, we read the following portion of Dr. Dana's trial testimony to state that the inmates' statements were of a type reasonably, but admittedly cautiously, relied upon by experts in the mental health field in forming opinions regarding whether a particular inmate is a malingerer:

> Q.   And so you relied upon information from other members, of course?

---

[3]Federal Rule of Evidence 801(c) defines the term "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c).

A.   Not only other members of the department but information regarding observed behaviors from people who were not in our department as well.

\* \* \*

Q.   What about other inmates, do you ever receive information from other inmates or people incarcerated at the BOP?

A.   Yeah. Occasionally. Though you have to be careful about that information but in this case there were two separate inmates during the time that Mr. Leeson was there that approached the other forensic psychologist. They did not talk to me directly.

\* \* \*

A.   *It is actually a standard in order to gather information about a person from sources and information. Again, you have to weigh the validity of all circumstances. In a situation where this was the only piece of information that I had, [I] would not generally rely on it. . . .*

Q.   *And, of course, you're speaking of the information provided by the inmates at the institution?*

A.   *Yes.*

(J.A. 545-47) (emphasis added). As for Leeson's argument that Dr. Dana was not in a position to determine whether the two fellow inmates were trustworthy sources of information, and therefore Dr. Dana could not have reasonably relied upon their statements in forming his expert opinion, Leeson's argument is a nonstarter given that Leeson had full opportunity at trial to cross-examine Dr. Dana on this point and to make such an argument to the jury in closing argument. Finally, on the issue of whether the district court made a determination that the probative value of the inmates' out-of-court statements substantially outweighed their prejudicial effect, we conclude from

our reading of the trial transcript that the district court implicitly made such a finding. We also conclude the district court properly determined that the probative value of the inmates' out-of-court statements outweighed their prejudicial effect. The information that Dr. Dana relied upon in formulating his expert opinion was highly and directly relevant to the jury's task of evaluating that opinion. The district court did not abuse its discretion in finding that such probative value substantially outweighed any prejudicial effect of the statements, especially given that Leeson had the opportunity to cross-examine Dr. Dana regarding the reasonableness of his reliance on the statements and the opportunity during closing argument to downgrade the credibility of such out-of-court statements in the eyes of the jury.

  In conclusion, we uphold the district court's admission of Dr. Dana's testimony regarding the challenged out-of-court statements by two of Leeson's fellow inmates at MCC Chicago.[4]

---

  [4]In a letter styled as notice of supplemental authority submitted pursuant to Federal Rule of Appellate Procedure 28(j) (Rule 28(j)), Leeson argued for the first time in this appeal that the district court's admission of Dr. Dana's testimony regarding the statements of his fellow inmates constituted error under *Crawford v. Washington*, 541 U.S. 36 (2004). From such letter, we infer that Leeson relies upon *Crawford* to argue that, regardless of the admissibility of Leeson's fellow inmates' out-of-court statements under Rule 703, such out-of-court statements are barred by the Sixth Amendment's Confrontation Clause, unless the inmates were unavailable to testify at trial and he had a prior opportunity to cross-examine them. This argument is a wholly different argument than the argument Leeson presented in the argument section of his opening brief in challenge to the district court's admission of the inmates' out-of-court statements through the testimony of Dr. Dana. Rather, in the argument section of his opening brief, Leeson challenges the district court's admission of the inmates' statements exclusively upon the basis that the statements constituted hearsay and did not otherwise qualify for admission under Rule 703.

  Because Leeson did not present his argument based upon *Crawford* in the argument section of his opening brief, and *Crawford* was readily available at the time Leeson filed his opening brief, Leeson's argument based upon *Crawford* is waived. *See* Fed. R. App. P. 28(a)(9) ("[T]he argument [section of appellant's brief] . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and

IV.

Finally, Leeson challenges the district court's determination that he qualified for an increased sentence under the ACCA. For reasons that follow, we hold the district court did not err by sentencing Leeson under the ACCA.

We begin our analysis of this issue by setting forth the relevant statutory framework. Under the ACCA, a defendant convicted of a § 922(g) offense, who also has three previous convictions "for a violent felony or serious drug offense, or both, committed on occasions different from one another," 18 U.S.C. § 924(e)(1), is subject to a sentencing increase from a ten year maximum, 18 U.S.C. § 924(a)(2), to a fifteen year minimum, 18 U.S.C. § 924(e)(1).

The district court counted Leeson's following three prior convictions as predicate convictions for purposes of sentencing him under the ACCA: (1) a 1988 conviction in Texas state court for burglary of a habitation with the intent to commit theft; (2) a 1984 conviction in Texas state court for aggravated robbery (Aggravated Robbery Conviction); and (3) a 1984 conviction in Texas state court for attempted

parts of the record on which the appellant relies."); *United States v. Kimler*, 335 F.3d 1132, 1138 n.6 (10th Cir. 2003) ("We will not address issues not raised in the appellant's opening brief, especially where the arguments are based on authority that was readily available at the time of briefing."); *United States v. Jones*, 308 F.3d 425, 427 n.1 (4th Cir. 2002) (finding *Apprendi v. New Jersey*, 530 U.S. 466 (2000) argument raised for the first time in Rule 28(j) letter was waived). *See also Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (alien petitioner waived argument on appeal raised for the first time in his reply brief by failing to raise it in his opening brief). Indeed, considering an argument advanced for the first time in a Rule 28(j) filing is not only unfair to the appellee, it also creates the risk of an improvident or ill-advised opinion being issued on an unbriefed issue. *See McBride v. Merrell Dow and Pharmaceuticals, Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986) ("[c]onsidering an argument advanced for the first time in a reply brief, then, is not only unfair to an appellee but also entails the risk of an improvident or ill-advised opinion on the legal issues tendered.") (internal citations omitted).

capital murder of a peace officer (Attempted Capital Murder Conviction). Leeson argued below and continues to argue on appeal that, for purposes of determining whether he has three predicate convictions qualifying him for an increased sentence under the ACCA, the district court could count his 1988 conviction in Texas state court for burglary of a habitation with the intent to commit theft and *either* the Aggravated Robbery Conviction or the Attempted Capital Murder Conviction, *but not both*, because these latter two violent felonies were not "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). The government contends these two violent felonies were "committed on occasions different from one another," *id.*, and, therefore, argues the district court did not err in determining that Leeson qualified for an increased sentence under the ACCA.

The following quote from the PSR sets forth the whole of the undisputed, underlying facts of Leeson's Aggravated Robbery Conviction and His Attempted Capital Murder Conviction:

> Court records reflect that on January 27, 1983, while in the course of committing theft of property owned by William Schiefen, Mr. Leeson threatened Mr. Schiefen by exhibiting and using a firearm. Those records further reflect that on January 27, 1983, with the intent to commit capital murder, Mr. Leeson attempted to cause the death of Ronald Lee Kruise, Sr., a peace officer in the lawful discharge of an official duty, by intentionally shooting a gun in the direction of Mr. Kruise, knowing at the time Mr. Kruise was a peace officer.

> The Houston, Texas, Police Department incident report reflects that on January 27, 1983, at approximately 8:30 p.m., Mr. Ronald Lee Kruise, Sr., an off duty police officer working outside security at the Food-a-Rama Food Store, observed an individual, later identified as Mr. Leeson, enter said store wearing a ski mask and carrying a double barreled sawed-off shotgun. Officer Kruise immediately dispatched the Houston Police Department and then positioned himself behind a vehicle in the parking lot of the store. Once inside the store, Mr. Leeson displayed the shotgun and ordered everyone to freeze. There were approximately 10 people

inside the store at this time. Mr. Leeson then pointed the shotgun at William Schiefen, the assistant manager, and demanded money. Mr. Leeson went with Mr. Schiefen to the various cash drawers and had Mr. Schiefen or other employees place the money in a green canvas bag. At one point, Mr. Leeson hit Mr. Schiefen on the neck with the shotgun, causing Mr. Schiefen to fall to the ground. Mr. Leeson also demanded that Mr. Schiefen empty all the cash from his pockets. Mr. Leeson ordered everyone to hit the floor and then left the store. After Mr. Leeson exited the store and proceeded to move away from the exit door, Officer Kruise yelled, "Freeze, Police." Mr. Leeson raised his shotgun and fired one shot at Officer Kruise. Officer Kruise responded by discharging his weapon at Mr. Leeson, who in turn fired a second shot from his shotgun at Office Kruise. Mr. Leeson then ran around the corner and through the parking lot where he encountered Mr. Kruise's son, Ronald Kruise, Jr., who was also an off duty police officer working security. Mr. Leeson fired three shots from a .357 caliber Smith and Wesson revolver at Officer Ronald Kruise, Jr. and then ran behind an apartment complex. By this time, officers from the Houston Police Department had arrived on the scene. Within a few minutes, Mr. Leeson was located attempting to hide in some foliage behind an apartment complex. According to the police report, Mr. Leeson failed to display both of his hands despite numerous requests. As he turned toward the officers with his right hand near his mid-section, the officers discharged their weapons, striking Mr. Leeson twice in the right leg. Mr. Leeson was subsequently arrested and taken into custody.

(J.A. 833-34).

Leeson's challenge to the district court's determination that he qualified for an increased sentence under the ACCA squarely presents for our review the issue of whether Leeson's aggravated robbery of the Food-a-Rama and his attempted capital murder of Police Officer Ronald Lee Kruise, Sr. (Officer Kruise, Sr.) constitute offenses "committed on occasions different from one another." 18 U.S.C. § 924(e)(1). Because this is an issue of law, our review is *de novo*.

*See United States v. Wardrick*, 350 F.3d 446, 451 (4th Cir. 2003). In analyzing this issue, we initially note our previous recognition that "Congress's use of the word 'occasion' [in § 924(e)(1)] implies that it intended the offenses underlying the predicate convictions to be distinct from one another." *United States v. Letterlough*, 63 F.3d 332, 335 (4th Cir. 1995). We have also explained that "occasions" are "those predicate offenses that can be isolated with a beginning and an end—ones that constitute an occurrence unto themselves." *Id.* at 335. Furthermore, we have held that, for purposes of determining the applicability of the ACCA, offenses occur on occasions different from one another when each offense "arose out of a *separate and distinct criminal episode*." *Id.* (internal quotation marks omitted).

In *Letterlough*, we listed several factors for courts to consider in determining whether two offenses arose out of a separate and distinct criminal episode for purposes of the ACCA: (1) whether the offenses arose in different geographic locations; (2) whether the nature of each offense was substantively different; (3) whether each offense involved different victims; (4) whether each offense involved different criminal objectives; and (5) after the defendant committed the first-in-time offense, did the defendant have the opportunity to make a conscious and knowing decision to engage in the next-in-time offense. *Id.* at 335-37.

> Courts have applied these factors independently, or in conjunction, to decide that a defendant's similar offenses are actually separate and distinct from one another. In essence, if any one of the factors has a strong presence, it can dispositively segregate an extended criminal enterprise into a series of separate and distinct episodes.

*Id.* at 336.

Careful application of the *Letterlough* factors to the facts of Leeson's aggravated robbery of the Food-a-Rama and his attempted capital murder of Officer Kruise, Sr. convinces us that these two offenses constitute offenses "committed on occasions different from one another," 18 U.S.C. § 924(e)(1), for purposes of the ACCA.

The first *Letterlough* factor cuts in favor of a single criminal episode. The two crimes occurred in the same geographic location. This

is so despite the fact that one crime occurred inside the store and the other crime occurred just outside the store. Leeson was still on the premises of the food store and, in Fourth Amendment parlance, was within its curtilege.

The second *Letterlough* factor cuts in favor of two separate and distinct criminal episodes. The two crimes are distinctly different in nature. While Leeson's aggravated robbery involved theft of another's property by threat of violence and one instance of the use of apparently non-deadly force (*i.e.*, Leeson's hitting Mr. Schiefen on the neck with the shotgun), Leeson's attempted capital murder of Officer Kruise, Sr. involved the use of deadly force with the intent to murder a peace officer.

The third *Letterlough* factor also cuts in favor of two separate and distinct criminal episodes. The crimes had decidedly different victims. The store owner and the store's then present employees and customers were the victims of Leeson's aggravated robbery, while Officer Kruise, Sr. was the victim of Leeson's attempted capital murder of a peace officer.

The fourth *Letterlough* factor cuts in favor of two separate and distinct criminal episodes. Leeson's aggravated robbery and attempted capital murder of a peace officer had different criminal objectives. The first to get money and the second to commit murder in order to effectuate his escape from the scene of the earlier aggravated robbery. As the district court aptly stated,

> [o]nce outside the door, the objective changed. The objective was to get away and Mr. Leeson was confronted with an obstacle, that being Officer Kruise and his gun and so Mr. Leeson then, in my opinion, changed objectives. Now his goal was to get away and to get rid of any obstacles in his path and that involved firing his weapon at the police officer.

(J.A. 747). Indeed, the point is proven by the fact that, while the effectuation of Leeson's escape may have been a part of Leeson's objective in committing the aggravated robbery, Leeson's commission of the aggravated robbery could not have been a part of Leeson's

objective in shooting Officer Kruise, Sr.; the aggravated robbery hav-
ing already been completed.

Application of the fifth *Letterlough* factor cuts in favor of two sep-
arate and distinct criminal episodes. The fifth factor considers
whether the defendant had the opportunity to make a conscious and
knowing decision to cease and desist his criminal behavior or engage
in yet another crime. The district court answered this question in the
affirmative:

> Did Mr. Leeson have the opportunity to cease and desist
> from his criminal actions before he shot at Officer Kruise?
> And my answer to that question is yes, he did, because the
> facts of the case indicate that Officer Kruise said to him,
> "freeze, police". Leeson then fired one shot at Kruise after
> being told to stop. Now if he had not been told to stop by
> Kruise, who identified himself as police, we might have an
> even more difficult question th[a]n the one that [Leeson's
> counsel] thinks we have here. But I believe that that's a crit-
> ical factor in this case, not that it took place within minutes
> or even seconds of his leaving the store, but rather the fact
> that when confronted by the police officer, who ordered him
> to freeze and identified himself as police, Mr. Leeson
> responded not by doing so but by shooting at the police offi-
> cer. Now this is in substance a significantly different crime
> th[a]n the one where he displays his shotgun and demands
> money.

(J.A. 747).

In this case, Officer Kruise, Sr. saw Leeson, wearing a ski mask
and carrying a double barreled sawed-off shotgun, enter the store. As
opposed to following him into the store and attempting an arrest,
given the crowded conditions of the store, Officer Kruise, Sr. posi-
tioned himself behind an automobile so as to afford coverage and
waited for Leeson to exit the store. When Leeson exited the store,
Officer Kruise, Sr. did yell "Freeze, Police," and that is when Leeson
raised the shotgun and fired one shot at Officer Kruise, Sr. Under that
scenario, the robbery had been successfully completed when Officer
Kruise, Sr. confronted Leeson.

Accordingly, we readily agree with the district court that Officer Kruise, Sr.'s verbal command that Leeson freeze along with his self-identification as a police officer cut heavily in favor of concluding that Leeson's aggravated robbery and his attempted capital murder of a peace officer were two separate and distinct criminal episodes. First, the aggravated robbery was actually complete at the time Leeson took custody and control of the money. Second, at the time Officer Kruise, Sr. ordered Leeson to freeze and identified himself to Leeson as a police officer, Leeson was unequivocally presented with the opportunity to cease and desist from engaging in further criminal conduct.

In the final analysis, the weight of the *Letterlough* factors cutting in favor of two separate and distinct criminal episodes (*i.e.*, distinctly different victims, distinctly different crimes, and Leeson's being presented with a clear opportunity to cease and desist his criminal behavior prior to the second-in-time crime) decidedly tips the scale in favor of Leeson's aggravated robbery and his attempted capital murder of a peace officer being separate and distinct criminal episodes and, thus, offenses committed on occasions different from one another for purposes of the ACCA. *Cf. United States v. Williams*, 187 F.3d 429 (4th Cir. 1999) (assault with a firearm on a governmental officer and assault with deadly weapon (on a different police officer) with intent to kill arose out of separate and distinct criminal episodes for purposes of ACCA, even though offenses were committed within three blocks of each other and within short period of time for purpose of escaping apprehension, when ten to fifteen minute interval between offenses gave defendant opportunity to cease and desist).

To be sure, the circumstances of Leeson's criminal conduct inside and then almost immediately just outside the Food-a-Rama readily fits the description of a crime spree. However, the crime-spree nature of Leeson's conduct does not require that we view his aggravated robbery offense and his attempted capital murder of a peace officer offense as part of a single criminal episode. Rather, our holding today that these two offenses constitute crimes committed on occasions different from one another for purposes of increasing Leeson's sentence under the ACCA is consistent with our case law which recognizes that, "'criminals who commit separate crimes against different individuals while on a spree, within a short period of time, provided that the perpetrator had the opportunity to cease and desist from his crimi-

nal actions at any time'" commit crimes on occasions different from one another. *United States v. Hobbs*, 136 F.3d 384, 390 (4th Cir. 1998) (quoting *United States v. Hudspeth*, 42 F.3d 1015, 1020 (7th Cir. 1994)).[5]

In sum, we uphold the district court's determination that Leeson qualified for an increased sentence under the ACCA.

V.

In conclusion, we affirm Leeson's conviction and sentence.

*AFFIRMED*

---

[5]We note that Leeson substantially relies on the Sixth Circuit's decision in *United States v. Graves*, 60 F.3d 1183 (6th Cir. 1995). In *Graves*, the defendant burglarized a home, encountered police in the woods near the home, and fled. *Id.* at 1184-85. One of the police officers at the scene ordered defendant to halt. *Id.* at 1185. The defendant "then stopped, turned, pointed a gun at the officer, and fled again." *Id.* Following his capture, the defendant pleaded guilty to burglary and assault. *Id.* The Sixth Circuit held that because the defendant had not yet left the location of the burglary when he committed the assault within moments of the burglary, the assault and the burglary were part of the same criminal episode and, thus, were not committed on occasions different from one another for purposes of the ACCA. *Id.* at 1187. While *Graves* does not appear to be materially distinguishable from the facts of Leeson's case, for the reasons we have already expressed in applying the *Letterlough* factors, we simply disagree with the Sixth Circuit's analysis.