PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

A HELPING HAND, LLC, A Maryland
Corporate Entity; JOHN DOE 1; JANE
DOE NUMBER 1; JOHN DOE 2,
            *Plaintiffs-Appellees,*

            and

JANE DOE NUMBER 2; JANE DOE
NUMBER 3,

            *Plaintiffs,*

            v.                                           No. 06-2026

BALTIMORE COUNTY, MARYLAND;
OFFICE OF THE ZONING
COMMISSIONER OF BALTIMORE
COUNTY; COUNTY COUNCIL OF
BALTIMORE COUNTY; BALTIMORE
COUNTY DEPARTMENT OF PERMITS AND
DEVELOPMENT MANAGEMENT,
            *Defendants-Appellants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.
(1:02-cv-02568-CCB;
1:05-cv-00844-CCB)

Argued: December 4, 2007

Decided: February 12, 2008

Before MOTZ and DUNCAN, Circuit Judges,
and Leonie M. BRINKEMA, United States District Judge
for the Eastern District of Virginia, sitting by designation.

Affirmed in part, reversed in part, vacated in part, and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Duncan and Judge Brinkema joined.

---

**COUNSEL**

**ARGUED:** Jeffrey Grant Cook, Paul M. Mayhew, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellants. Richard A. Simpson, ROSS, DIXON & BELL, L.L.P., Washington, D.C., for Appellees. **ON BRIEF:** John E. Beverungen, County Attorney, BALTIMORE COUNTY OFFICE OF LAW, Towson, Maryland, for Appellants. Deborah A. Jeon, ACLU OF MARYLAND, Baltimore, Maryland; Jimmy R. Rock, ROSS, DIXON & BELL, L.L.P., Washington, D.C., for Appellees.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the enactment of a county zoning ordinance rendering operation of a methadone treatment clinic at its chosen location unlawful. The clinic alleges that the ordinance violates the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213 (2000 & Supp. 2005), and the Due Process Clause of the Fourteenth Amendment. After the close of all evidence, the district court granted judgment as a matter of law to the clinic on its ADA disparate impact claim and one element of its ADA intentional discrimination claim. After deliberation, the jury returned a verdict for the clinic on the remaining elements of its ADA intentional discrimination claim and its due process claim. The district court then granted the clinic declaratory and injunctive relief. The County appeals. For the reasons that follow, we affirm in part, reverse in part, vacate in part, and remand the case for further proceedings consistent with this opinion.

I.

A Helping Hand, LLC ("the Clinic") is a for-profit methadone clinic located in Baltimore County, Maryland, which Joel Prell, a

local resident, established in 2002. Methadone, a federally-approved drug, is used to treat severe, chronic opioid addiction, including heroin addiction. Methadone helps addicts to stop using narcotics by blocking the physical craving for other opioids. Like many other methadone clinics, the Clinic provides methadone maintenance treatment to eligible, admitted patients, along with services such as counseling.

Prell began looking into the possibility of opening a private methadone clinic in Baltimore County in 2001 and identified 116 Slade Avenue as a possible location. In November 2001, Prell wrote to the County Department of Permits and Development Management to inquire about the possibility of opening a methadone clinic at the Slade Avenue site. On November 21, the County notified Prell in writing that a drug addiction counseling and treatment center constituted a use "permitted by right" under the zoning ordinance applicable to the Slade Avenue site, but that a "change of occupancy permit" might be required before establishing a clinic at that site. Prell promptly inquired about the need for a change of occupancy permit; the County then informed him that because the Slade Avenue site was currently being used as a medical office, establishing a methadone treatment center at the site would not require a change of occupancy permit and he did not need to submit any additional documentation. Relying on this advice, Prell arranged for incorporation of the Clinic, entered into a lease for the Slade Avenue site, and applied for the required federal and state certifications and permits.

Soon, the surrounding community learned of these plans and voiced strong opposition to the proposed location of the Clinic. Local community associations distributed flyers, scheduled meetings, held public demonstrations, and organized letter writing and telephone campaigns in an attempt to prevent the Clinic from opening. Some of the protests became very heated; for example, police officers were needed to control a protest outside of the Clinic during a community open house. Several local newspapers extensively reported on the protests, and a community association website posted updates about the organized community opposition to the Clinic.

Kevin Kamenetz, the County councilman representing the district in which the Clinic sought to open, became actively involved in the

organized opposition to the Clinic. In addition to enlisting the support of state officials in this effort, Councilman Kamenetz regularly communicated with the community leaders opposing the Clinic and participated in open community meetings to develop strategies to prevent the Clinic from opening.

On April 1, 2002, Councilman Kamenetz introduced to the County Council legislation that he had helped to write, Bill 39-02 ("the Bill"). The Bill created a new category — "state-licensed medical clinics" — which included drug abuse treatment centers, and proposed new zoning requirements for that category. The Bill provides that these "state-licensed medical clinics" could no longer operate as a matter of right in commercial zones; instead, such clinics can operate in commercial zones only by "special exception," requiring a permit and a public hearing before any permit can be issued. Additionally, the Bill required such clinics to be located at least 750 feet from the nearest residence. After introduction of the Bill, the County Council scheduled a work session for April 9, 2002, so that members of the community could voice comments about the proposed Bill to the Council. At the work session, several leaders of community groups that had organized in opposition to the Clinic spoke in support of the Bill.

Bill 39-02 was not the County's first attempt to use a new zoning ordinance to prevent a methadone clinic from operating. In 1998, the County had sought to prevent a different methadone treatment clinic from opening by requiring that the clinic prevail at a public hearing before being permitted even to apply for a zoning permit. A federal court held that process to violate the ADA, however. *Smith Berch, Inc. v. Baltimore County*, 115 F. Supp. 2d 520 (D. Md. 2000), *vacated on other grounds*, *Smith-Berch, Inc. v. Baltimore County*, 64 F. App'x 887 (4th Cir. 2003). Opponents of A Helping Hand, including Councilman Kamenetz and other public officials, knew the holding of the prior case — in Kamenetz' words, that "methadone clinics must be treated the same as any other type of medical clinic . . . when choosing a location" — and they understood that their plan to prevent the Clinic from opening presented potential ADA problems. As Councilman Kamenetz explained at a community meeting, Bill 39-02 contained this new (narrowly defined) category of "state-licensed medical clinics" because it was not permissible for legislation to "suggest that a methadone clinic itself could be treated differently."

Meanwhile, Prell continued the process of obtaining the necessary permits to open A Helping Hand. By March 2002, Prell had received approval from all of the relevant federal agencies, including the Drug Enforcement Administration, the Substance Abuse and Mental Health Services Administration, and the Council on Accreditation. During a site visit to the Clinic on April 2, 2002, state officials stated that the Clinic was "in compliance, and . . . should be receiving [its necessary state] license shortly." A week later, however, state officials notified Prell that the County had advised them that Prell had not submitted materials demonstrating that the Clinic's site plan and parking were adequate and that therefore the Clinic's occupancy permit had "not yet been approved," so the State would not issue the necessary state license.[1] Prell promptly contacted the County, which told him that it had erred in earlier informing him that the Clinic needed neither an occupancy permit nor any supporting documentation. Now, the County contended that the Clinic was required to submit a site plan and parking plan to obtain an occupancy permit. Prell testified that, during this period, he overheard a conversation in which a County official assured the head of a local community association that the Clinic would never be allowed to open.

Prell subsequently submitted the requested site and parking plans to the County. The County still refused to issue the occupancy permit and required the Clinic to submit a plan depicting the utilities, including the plumbing and electrical operation of the building. The Clinic promptly submitted this additional documentation, and on April 15, the County finally issued the Clinic an occupancy permit. That same morning, Prell hand-delivered the permit to the Maryland Department of Health and Mental Hygiene and obtained from the Department the necessary state license. Accordingly, by the morning of April 15, 2002, the Clinic had received final federal, state, and county approval, including a valid County zoning permit.

---

[1]On March 7, 2002, Councilman Kamenetz had written to two state senators enlisting their help in preventing the Clinic "from coming to Pikesville." Kamenetz explained that State help was necessary because "[e]fforts by the County to address this issue through zoning were rejected by the Federal Courts, which ruled that methadone clinics must be treated the same as any other type of medical clinic or doctor's office when choosing a location."

Later that same day, April 15, 2002, the County Council voted to enact Bill 39-02, and the County Executive signed the Bill into law the next morning, April 16, 2002. Although not unprecedented, several aspects of the Bill's enactment departed from normal procedure. The County Council passed the Bill only fifteen days after its initial introduction, in marked contrast to the one to two months County officials frequently took to enact new legislation. Moreover, the County Council voted that the legislation would become effective on the date of enactment, rather than on the normal default effective date of forty-five days after enactment.

Additionally, shortly before enacting the Bill, the County Council revised it in one significant respect. As originally proposed, the Bill granted a six-month grace period to clinics established shortly before the Bill's effective date that extended the time in which those clinics were required to come into compliance with the Bill's provisions. At the eleventh hour, however, the County Council amended the Bill to grant this grace period *only* to clinics established *and operating* prior to the Bill's effective date.

Soon after enacting the Bill, the County moved to enforce it against the Clinic, threatening to fine the Clinic $200 a day and to seek civil penalties unless the Clinic ceased operation. The Clinic challenged the citation, claiming entitlement, at the very least, to the six-month grace period, because it began operating on the afternoon of April 15, a day before the April 16 effective date of the Bill. The County rejected this argument and began assessing fines against the Clinic. Meanwhile, the County granted a variance to the only other facility to which the Bill applied, a kidney dialysis center, permitting the dialysis center to open without meeting the requirements of the Bill.

On August 2, 2002, the Clinic filed this action on its own behalf, alleging two claims for violation of Title II of the ADA — one for intentional discrimination and one for disparate impact — and one claim that the County violated the Due Process Clause. The County agreed to postpone further enforcement of the Bill pending the outcome of this lawsuit. Three individual patients later joined the suit as "Doe" plaintiffs, each alleging the same two ADA claims as the Clinic and an additional claim for unlawful interference with their rights under the ADA.

Following lengthy and contentious discovery, the case was tried for ten days before a jury. After the close of all evidence, the district court granted judgment as a matter of law to the Clinic and the Doe plaintiffs on their ADA disparate impact claims and one element of their ADA intentional discrimination claims. The jury then considered the remaining claims. The jury returned a verdict for the Clinic on the due process claim and a verdict for the Clinic and Doe plaintiffs on the ADA intentional discrimination claims, but awarded the Doe plaintiffs zero dollars in damages (the Clinic did not seek money damages). The jury returned a verdict for the County on the individual Doe plaintiffs' claims that the County unlawfully interfered with their rights under the ADA.

The district court accordingly awarded judgment to the County on the unlawful interference claims brought by the Doe plaintiffs and declaratory judgment and injunctive relief to the Clinic and Doe plaintiffs on their successful ADA and due process claims. Only the County appeals. We first consider the ADA claims and then the due process claim.

II.

Congress enacted the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Pub. L. No. 101-336, § 2(b)(1), 1990 U.S.C.C.A.N. (104 Stat.) 327, 329 (codified at 42 U.S.C. § 12101(b)(1)). The Act prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111-12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189. *See Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).

This case concerns Title II of the ADA, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines "public entity" to include local governments like Baltimore County, *id.* § 12131(1)(A), and on appeal the County does not dispute that

municipal zoning qualifies as a public "program" or "service" and the enforcement of zoning ordinances constitutes an "activity" of a local government within the meaning of Title II.[2]

Title II creates a remedy for "any person alleging discrimination on the basis of disability" and provides that the "remedies, procedures, and rights" available under Title II are the "remedies, procedures, and rights set forth in section 794a of [the Rehabilitation Act]." *Id.* § 12133. Section 794a of the Rehabilitation Act, in turn, provides that the available "remedies, procedures, and rights" are those set forth in Title VII of the Civil Rights Act. 29 U.S.C. § 794a(a)(1) (2000).

Pursuant to congressional instruction, *see* 42 U.S.C. § 12134(a), the Attorney General has issued regulations implementing Title II of the ADA. *See* 28 C.F.R. pt. 35 (2007). These regulations provide further guidance interpreting many of the provisions of Title II. Although the Supreme Court has yet to decide whether the regulations are entitled to the full deference afforded under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 844 (1984), the Court has counseled that the views expressed by the Department of Justice in the implementing regulations "warrant respect." *Olmstead v. L.C.*, 527 U.S. 581, 597-98 (1999).

In addition to the provisions of the statute and the implementing regulations, Congress has directed courts to construe the ADA to grant at least as much protection as the Rehabilitation Act and its implementing regulations. 42 U.S.C. § 12201(a); *see also Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998). Moreover, because the ADA "echoes and expressly refers to Title VII, and because the two statutes have the same purpose," courts confronted with ADA claims have

---

[2]Other courts have so held. *See, e.g.*, *Wis. Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 750 (7th Cir. 2006); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003); *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 730-32 (9th Cir. 1999). Moreover, the Supreme Court has cited irrational zoning decisions as one example of disability discrimination that supported the need for Title II's prophylactic measures. *Lane*, 541 U.S. at 525; *see also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487 (4th Cir. 2005).

also frequently turned to precedent under Title VII. *See, e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) (collecting cases). Thus, courts have construed Title II of the ADA to allow a plaintiff to pursue three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations. *See, e.g.*, *Wis. Cmty. Servs.*, 465 F.3d at 753; *Tsombanidis*, 352 F.3d at 573; *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52-53 (2003) (citing Title VII cases in discussing disparate treatment and disparate impact claims under Title I of the ADA).

With this authority to guide us, we turn to the specific ADA issues in the case at hand.

### A.

The County first argues that the Clinic does not have standing to bring suit under Title II of the ADA. Whether a party has standing to bring a claim in federal court involves "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Kowalski v. Tesmer*, 543 U.S. 125, 128-29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Unquestionably, the Clinic has met the minimum constitutional standing requirements. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The County maintains that the Clinic lacks prudential standing to bring an ADA claim for injury it suffers because of its association with ADA-protected patients.

Prudential standing "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth*, 422 U.S. at 509. However, this rule is "subject to exceptions, the most prominent of which is that Congress may remove it by statute," either "expressly or by clear implication." *Id.* at 509-10. Thus, Congress may, by statute, empower one party to bring suit because of harm *it* suffers due to unlawful discrimination against another party. The County acknowledges this but maintains that because Title II contains no explicit recognition of an "association" cause of action, the Clinic lacks prudential standing.[3]

---

[3]The County mixes together and confuses an ADA cause of action based on associational discrimination with the doctrines of third-party

Whatever appeal this argument has in a vacuum collapses upon scrutiny of the statute as a whole. When we consider the assertedly fatal absence of an express "association" discrimination provision in Title II in light of the statute's language, structure, and legislative history, the regulations promulgated pursuant to it, and the well-reasoned and unanimous view of our sister circuits, we must reject the County's argument.

First, although Title II contains no express right to be free from discrimination because of association with qualified individuals with disabilities, Title II's enforcement provision does *not* limit its remedies to individuals with disabilities. Rather, Title II expressly provides a remedy to "*any person* alleging discrimination on the basis of disability in violation of section 12132." 42 U.S.C. § 12133 (emphasis added); *see also* 1 U.S.C. § 1 (2000) (defining "person" to include various entities). This broad language in the enforcement provision "evinces a congressional intention to define standing to bring a private action . . . as broadly as is permitted by Article III of the Consti-

---

standing and associational standing. The doctrine of third-party standing permits a plaintiff to bring suit on behalf of a third party *for injury done to the third party* in certain circumstances when the third party cannot effectively protect its own interests. *See Kowalski*, 543 U.S. at 129-30. The doctrine of associational standing permits an organization to bring suit on behalf of its members *for injury done to its members* when (among other requirements) its members would have standing to sue in their own right. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551-53 (1996). Although these two standing doctrines differ, they are similar in that they both allow a plaintiff to bring suit based not on injury to itself but on injury to another.

In contrast, a cause of action based on ADA associational discrimination permits a plaintiff to bring suit on its own behalf *for injury it itself suffers* because of its association with an ADA-protected third party. *See MX Group, Inc. v. City of Covington*, 293 F.3d 326, 335 (6th Cir. 2002). The only standing question at issue in this appeal is whether the Clinic can bring claims *on its own behalf* for injury it suffered because of its association with ADA-protected persons; therefore we need not consider whether the Clinic has third-party or associational standing to bring suit on behalf of its clients.

tution." *MX Group*, 293 F.3d at 334 (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997), *superseded by Rule on other grounds as stated in Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001)) (internal quotation marks and alterations omitted).

This interpretation seems particularly reasonable when we look to the text of the statute as a whole and the accompanying legislative history. Titles I, II, and III of the ADA do not contain neatly drawn parallel provisions; while Titles I and III list many specific actions that constitute discrimination, Title II simply provides a blanket prohibition on discrimination without listing any specific acts that are proscribed. *Compare* 42 U.S.C. §§ 12112(b) (Title I) *and id.* § 12182(b) (Title III) *with id.* § 12132 (Title II). When listing the specific actions that constitute discrimination in Titles I and III, Congress expressly protected entities that suffer discrimination "because of the known disability of an individual with whom the . . . entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E) (Title III); *see also id.* § 12112(b)(4) (Title I); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994). Certainly aware of this asymmetry, the House Committee on Education and Labor explained that, in Title II, "[t]he Committee has chosen not to list all the types of actions that are included within the term 'discrimination', as was done in titles I and III . . . . The Committee intends, however, that the forms of discrimination prohibited by [Title II] be identical to those set out in the applicable provisions of titles I and III of this legislation." H.R. Rep. No. 101-485(II), at 84 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 367; *see also* S. Rep. No. 101-116, at 44 (1989). Of course, Titles I and III do provide a cause of action for associational discrimination. *See* 42 U.S.C. §§ 12112(b)(4), 12182(b)(1)(E).

Furthermore, Congress specifically directed the Attorney General to promulgate regulations implementing Title II that "shall be consistent with this chapter." 42 U.S.C. § 12134(a), (b); *see also* H.R. Rep. No. 101-485(III), at 52 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 445, 475 ("The Committee intends that the regulations under title II incorporate interpretations of the term discrimination set forth in titles I and III . . . ."); H.R. Rep. No. 101-485(II), at 84 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 367 ("[T]he construction of 'discrimina-

tion' set forth in section 102(b) and (c) and section 302(b) should be incorporated in the regulations implementing this title."). In response to this congressional directive, the Attorney General promulgated regulations implementing Title II that do indeed bar associational discrimination. These regulations explicitly prohibit local governments from discriminating against entities because of the disability of individuals with whom the entity associates. 28 C.F.R. § 35.130(g). Additionally, the appendix to the regulations clarifies that this provision is "intended to ensure that entities such as health care providers . . . and others who provide professional services to persons with disabilities are not subjected to discrimination because of their professional association with persons with disabilities." 28 C.F.R. § 35.130(g) app. A.

Finally, every circuit that has considered whether a methadone clinic has standing under Title II of the ADA to bring a claim based on injuries resulting from its association with the addicted persons it serves has found that the clinic does have standing. *See Addiction Specialists, Inc. v. Township of Hampton*, 411 F.3d 399, 405-07 (3d Cir. 2005); *MX Group*, 293 F.3d at 331-36; *Innovative Health Sys.*, 117 F.3d at 46-48. We too find that prudential considerations do not bar the Clinic's claims under Title II of the ADA, and the Clinic has alleged a sufficient association with individuals with disabilities to state a claim under the ADA.[4]

---

[4]Contrary to the County's insistence, we did not hold to the contrary in *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002). Indeed, to the extent *Freilich* is relevant here, it entirely accords with our present holding. In *Freilich*, we initially addressed a question not at issue here — whether the plaintiff doctor had third-party standing to bring a Title II ADA claim *on behalf of her patients*. We held that she did not because she had not alleged "sufficient obstacles to the patients bringing suit themselves." *Id.* at 215. Dr. Freilich alleged *no Title II associational discrimination claim*, like the claims asserted by the Clinic here. The doctor did allege a Title III associational discrimination claim based on her "patient advocacy." *Id.* We also rejected this claim — but not because we questioned the existence of associational discrimination claims or because we (like the County in the case at hand) equated an associational discrimination claim to one of third-party or associational standing. Rather, we had no trouble recognizing that Title III provided for associational discrimination claims, but concluded that Dr. Freilich's

But this hardly ends our inquiry.

### B.

Even if the Clinic has standing to bring its ADA claims, the County maintains that the district court erred in granting a Rule 50 motion to the Clinic. Specifically the County contends that the district court erred in holding that, as a matter of law, the Clinic had established that its clients were "regarded as" disabled within the meaning of the ADA.

To be eligible for any protection under the ADA, an individual must be disabled within the meaning of the Act. The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) *being regarded as* having such an impairment." 42 U.S.C. § 12102(2) (emphasis added). Under the third prong of this definition, the prong on which the district court granted the Rule 50 motion, an individual is disabled if regarded as such, whether or not he in fact has a substantially limiting impairment. *See Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 302 (4th Cir. 1998).

Once the district court had made its ruling that the Clinic had established disability as a matter of law under the "regarded as" prong, the Clinic rested on this ruling and did not contend that its clients were also disabled under the first two prongs. Because the ADA protects only those individuals who are disabled within the meaning of the Act, the district court's ruling thus provided a necessary element of

---

complaint did not state such a claim because she alleged only "a loose association with disabled patients." *Id.* at 216. We properly reasoned that "generalized references to association with disabled persons or to advocacy for a group of disabled persons are not sufficient to state a claim for associational discrimination under the ADA." *Id.* We do not in any way retract those words. The Clinic, however, has alleged and offered overwhelming (indeed, undisputed) evidence of far more than a "loose association with disabled patients"; the Clinic's sole raison d'etre is the full-time provision of treatment and services to recovering drug addicts.

the Clinic's disparate impact claim *and* its intentional discrimination claim. Accordingly, if the district court erred in its "regarded as" ruling, we must reverse its judgment in favor of the Clinic on *both* ADA claims.

We review the district court's grant of a Rule 50 motion *de novo*, viewing the evidence in the light most favorable to the party opposing the motion, here the County, and drawing all reasonable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). We must affirm if a reasonable jury could only rule in favor of the Clinic; if reasonable minds could differ, we must reverse. *See Dennis*, 290 F.3d at 644-45.

1.

The County initially argues that the district court erroneously based its Rule 50 "regarded as" ruling on the views of community members, not those of the County itself. Moreover, according to the County, no record evidence indicates that the County itself (i.e., the seven-member governing County Council) even knew of the community opposition. These arguments ignore both controlling law and uncontroverted record evidence.

First, contrary to the County's apparent contentions, it is well-established that community views may be attributed to government bodies when the government acts in response to these views. *See, e.g.*, *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 448 (1985); *Marks v. City of Chesapeake*, 883 F.2d 308, 311-12 (4th Cir. 1989) (citing numerous cases). Second, in this case, the record contains abundant uncontroverted evidence that the County Council knew of and legislated in response to community opposition to the Clinic.

Uncontroverted circumstantial evidence strongly indicates that the members of the County Council must have known of the community opposition. To prevent establishment of the Clinic, community associations distributed flyers, held public demonstrations, established and kept current a website, and organized writing and telephone campaigns. The local media extensively publicized these activities. Opposition to the Clinic became so vociferous one evening that the County

had to detail police officers to quell it. Moreover, all of this occurred within months of the County's well-publicized loss of a federal court case resulting from its attempt to outlaw another methadone clinic through zoning. Furthermore, the County admits that it included a study on methadone use in Baltimore City in the Bill file, suggesting that the members of the Council knew that the opposition to the Clinic motivated the Bill's introduction.

But the Clinic did not need to rely only on this circumstantial evidence because it also had uncontroverted direct evidence that the Baltimore County Council knew of the community opposition to the Clinic. One of the seven County Council members, Kevin Kamenetz, himself became actively involved in the opposition to the Clinic. Councilman Kamenetz not only met with community groups, he also contacted state officials to enlist their support in this effort. Clearly, Councilman Kamenetz was well aware of the community's views.

Finally, it is undisputed that the County held an open work session on the Bill shortly after its introduction. There, the entire County Council heard several members of the community voice strong opposition to the Clinic and strong support for the new legislation, after which the Council voted to adopt the new legislation. Under our precedent, this fact alone would be enough to find that the Council enacted the Bill in response to community opposition. *See Marks*, 883 F.2d at 309-11, 313 (holding a city council's refusal "[w]ithout further discussion" to grant permit, after hearing community opposition to its grant, provided sufficient evidence that council denied permit based on those same "impermissible . . . considerations").

Given these undisputed facts, we agree with the district court that no reasonable juror could conclude that the County Council did not know of — and legislate in response to — the community's opposition to the Clinic.

2.

The far more difficult question is whether the record evidence also establishes, as a matter of law, that the community (and therefore the County) regarded the Clinic's clients as disabled. An individual is "regarded as" disabled within the meaning of the ADA if he:

(i) Has a physical or mental impairment that does not sub-
stantially limit major life activities but that is treated by a
public entity as constituting such a limitation; [or]

(ii) Has a physical or mental impairment that substantially
limits major life activities only as a result of the attitudes of
others toward such impairment . . . .

28 C.F.R. § 35.104; *see also Cline*, 144 F.3d at 302.

Unquestionably, drug addiction constitutes an impairment under
the ADA. *See United States v. S. Mgmt. Corp.*, 955 F.2d 914, 919 &
n.3 (4th Cir. 1992); *Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435,
439 (8th Cir. 2007) (citing *Thompson v. Davis*, 295 F.3d 890, 896
(9th Cir. 2002)); *Reg'l Econ. Cmty. Action Program, Inc. v. City of
Middletown*, 294 F.3d 35, 46 (2d Cir. 2002); H.R. Rep. No. 101-
485(II), at 51, *as reprinted in* 1990 U.S.C.C.A.N. 303, 333 ("physical
or mental impairment" includes "drug addiction[ ] and alcoholism").
Moreover, the County makes no argument that the Clinic's clients
were not addicted to opiates.

However, "[m]erely having an impairment does not make one dis-
abled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Wil-
liams*, 534 U.S. 184, 195 (2002). An ADA claimant must also
demonstrate that drug addiction was regarded as "substantially limit[-
ing]" one or more "major life activities" or that drug addiction actu-
ally substantially limited one or more "major life activities" because
of the attitudes of others towards the addiction. 28 C.F.R. § 35.104.
The Supreme Court has emphasized that the terms "substantially lim-
its" and "major life activities" "need to be interpreted strictly to create
a demanding standard for qualifying as disabled." *Toyota Motor*, 534
U.S. at 197.

The ADA does not define "major life activities." The regulations
do provide a representative, but nonexhaustive, list of "major life
activities" that includes "caring for one's self, . . . learning, and work-
ing." 28 C.F.R. § 35.104. The touchstone for determining whether an
activity constitutes a major life activity is its "significance" or "impor-
tance." *See Bragdon*, 524 U.S. at 638-39. "Major life activities"

"refer[ ] to those activities that are of central importance to daily life." *Toyota Motor*, 534 U.S. at 197.

The district court held that the County regarded the Clinic's clients as significantly impaired in the major life activities of working or obtaining employment, learning, thinking, caring for one's self, and interacting with others. The County only contends that this last category — interacting with others — is not a major life activity and that the district court erred in so holding. Although some courts have held that interacting with others does constitute a major life activity, *e.g.*, *McAlindin v. County of San Diego*, 192 F.3d 1226, 1234-35 (9th Cir. 1999), we have expressed skepticism on that point. *See Rohan v. Networks Presentations, LLC*, 375 F.3d 266, 274 (4th Cir. 2004). We need not decide the question here, however, because drawing all reasonable inferences in favor of the County, we cannot conclude, as a matter of law, that the clients of the Clinic were regarded as significantly impaired in a major life activity, even assuming that interacting with others constitutes such an activity.

The record does contain substantial evidence that the Clinic's clients were regarded as criminals and generally undesirable neighbors and, further, that this perception accords with the stigma that often attaches to recovering drug addicts. That the Clinic's clients were regarded as criminals and undesirables, however, does not mean that they were necessarily regarded as significantly impaired in their ability to work, learn, care for themselves, or interact with others. A jury could reasonably infer that the community believed that the clients turned to crime as the way to support their drug habits and so regarded the clients as impaired in their ability to maintain legitimate employment. However, a person can maintain a legitimate job while addicted to opiates and engaged in criminal conduct. Thus, a jury could also reasonably infer that the clients, even though regarded as criminals, were not regarded as significantly impaired in their ability to work or obtain a job. Similarly, it does not necessarily follow that because the clients were regarded as criminals and undesirable neighbors, they were also regarded as unable to learn, interact with others, or care for themselves — again, a jury could permissibly draw these inferences, but it need not do so.

To be sure, the record contains evidence that *some* members of the community did regard the Clinic's clients as unable to hold down

legitimate jobs or interact normally with others. Although record evidence indicates that this view accorded with common perceptions of recovering drug addicts, the record does not establish, as a matter of law, that a jury could only infer that this perception was widespread in this case. Similarly, some record evidence supports the conclusion that the Clinic's clients were significantly impaired in their ability to work or obtain a job because of the negative attitudes of others. *See* 28 C.F.R. § 35.104. Once again, however, this is not the only inference a reasonable jury could draw.

In sum, although we have no difficulty concluding that a reasonable jury could have found that the community regarded the Clinic's clients as significantly impaired in one or more major life activities, we cannot conclude that this is the only outcome a reasonable jury could have reached. Rather, drawing all reasonable inferences in favor of the County, we must hold that the district court erred in granting judgment as a matter of law on this issue. Because this ruling provided a necessary element of *both* ADA claims, we must reverse the order of the district court granting judgment to the Clinic and Doe plaintiffs on these claims.[5]

### III.

In addition to its ADA claims, the Clinic alleged and the jury found that the County violated the Clinic's substantive due process rights. To prevail on a substantive due process claim, a party must establish "(1) that it had property or a property interest; (2) that the state deprived it of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." *Tri-County Paving, Inc. v. Ashe County*, 281 F.3d 430, 440 (4th Cir. 2002) (quoting *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 827 (4th Cir. 1995)) (alterations omitted); *see also Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978) (local governments are subject to suit for constitutional violations under 42 U.S.C. § 1983).

---

[5]Given our reversal of the district court's judgment with respect to both ADA claims, we need not reach the County's other arguments with respect to those claims.

## A.

The County principally contends that the district court erred in certain respects in its due process jury instructions. Before addressing those arguments, however, we explain why we do not and cannot consider other arguments the County briefly asserts as to the due process claim.

First, the County raised only its jury instructions arguments in its opening brief; it did not raise these other arguments until its reply brief. "It is a well settled rule that contentions not raised in the argument section of the *opening brief* are abandoned." *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (emphasis added); *see also* Fed. R. App. P. 28(a)(9); *United States v. Leeson*, 453 F.3d 631, 638 n.4 (4th Cir. 2006) (collecting cases). We recognize, however, that in rare circumstances, appellate courts, in their discretion, may overlook this rule and others like it if they determine that a "miscarriage of justice" would otherwise result. *See Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005). But here the County has not even explained why it failed to raise these arguments earlier, let alone explained why, absent our consideration, a miscarriage of justice would result.[6]

One argument made in the reply brief, however, merits further discussion. That is the contention that the due process claim "should

---

[6]We also note that, with the exception of the argument discussed *infra* in text, the arguments raised in the reply brief are meritless. For example, in its reply brief, the County asserts that no substantive due process claim "lies in the context of economic and property rights disputes" because takings claims have "supplanted — in a sense preempted — substantive due process claims when land and property rights are at issue." In *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540-43 (2005), however, the Supreme Court explicitly distinguished between takings and substantive due process claims in this context, noting that a challenge to a governmental action that does not "substantially advance[ ]" legitimate government interests is a substantive due process claim, not a takings claim. As Judge Rymer recently explained, *Lingle* thus "pulls the rug out" from an argument that takings claims "preclud[e] substantive due process [property] claims based on arbitrary or unreasonable conduct." *Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855 (9th Cir. 2007).

never have been submitted to the jury" because the evidence offered at trial was insufficient to support such a claim. *See* Reply Br. at 27. Prevention of a "miscarriage of justice" might lead us to consider this argument if the only barrier to such consideration was counsel's failure to present it clearly in its principal brief. But, in fact, another — and insurmountable — barrier prevents our consideration of this contention. The County failed to move for judgment under Rule 50(b) in the district court and so did not preserve this challenge to the sufficiency of the evidence for appellate review.

At the close of evidence, but prior to any jury deliberations, the County did move, pursuant to Rule 50(a), for judgment as a matter of law on all claims. The district court expressly reserved the County's pre-verdict Rule 50(a) motion with respect to the Clinic's substantive due process claim. After the jury returned a verdict for the Clinic on the due process claim, the court denied the motion that it had previously reserved under Rule 50(a). The district court also advised the parties that they had ten days to renew their motions for judgment. The County, however, *never* renewed its motion; that is, it never made a post-verdict motion for judgment pursuant to Rule 50(b).

The Supreme Court has held time and again that "a party's failure to file a postverdict motion under Rule 50(b)" leaves an appellate court "'without power to direct the District Court to enter judgment contrary to the one it had permitted to stand.'" *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 400-01 (2006) (quoting *Cone v. W. Va. Pulp & Paper Co.*, 330 U.S. 212, 218 (1947)). Most recently, the Court clarified that an appellate court lacks the power even to order a new trial if a party has failed to file a Rule 50(b) motion following a jury verdict. *Id.* at 401-02.

Moreover, a properly-filed Rule 50(b) motion is equally necessary when, as here, "the district court [has] expressly reserved a party's preverdict motion for a directed verdict and then denied that motion after the [jury] verdict was returned." *Id.* at 401 (citing *Johnson v. N.Y., New Haven & Hartford R.R.*, 344 U.S. 48 (1952)). As Justice Thomas explained for the Court in *Unitherm*, a district court's denial of a party's Rule 50(a) motion provides no basis for an appeal based on sufficiency of the evidence because:

[W]hile a district court is permitted to enter judgment as a matter of law when it concludes [under Rule 50(a)] that the evidence is legally insufficient, it is not required to do so. . . .

    . . . .

    Thus, the District Court's denial of [a] preverdict motion cannot form the basis of [an] appeal, because the denial of that motion was not error. It was merely an exercise of the District Court's discretion, in accordance with the text of . . . Rule [50(a)] and the accepted practice of permitting the jury to make an initial judgment about the sufficiency of the evidence. The only error here was counsel's failure to file a postverdict motion pursuant to Rule 50(b).

*Id.* at 405-06.

Like the appellant in *Unitherm*, the County "failed to renew its preverdict motion as specified in Rule 50(b)," and so, like the appellate court in *Unitherm*, we have "no basis for review." *Id.* at 407. We are thus foreclosed from considering the County's challenge to the sufficiency of the evidence on the substantive due process claim. We therefore turn to the County's contentions with respect to the jury instructions without reaching the merits of its sufficiency challenge.

B.

The County appeals two aspects of the district court's jury instructions on the Clinic's substantive due process claim.[7] We review the district court's jury instructions for abuse of discretion. *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 432 (4th Cir. 2004). An error of law constitutes an abuse of discretion. *See Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 595 (4th Cir. 2005).

---

[7]Although we cannot consider any of the County's challenges to the sufficiency of the evidence, we may review whether the court erred when instructing the jury. *See, e.g.*, *Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 199-201 (2d Cir. 2004).

1.

First, the County contends that the district court erred in instructing the jury that the Clinic had a property interest in its continued operation at the Slade Avenue location. We look to state law to determine whether the Clinic had a cognizable property interest that could trigger federal due process guarantees. *Scott v. Greenville County*, 716 F.2d 1409, 1418 (4th Cir. 1983); *cf. Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

Under Maryland law,

> it is established that in order to obtain a 'vested right' in the existing zoning use which will be constitutionally protected against a subsequent change in the zoning ordinance prohibiting or limiting that use, the owner must (1) obtain a permit or occupancy certificate where required by the applicable ordinance and (2) must proceed under that permit or certificate to exercise it on the land involved so that the neighborhood may be advised that the land is being devoted to that use.

*Powell v. Calvert County*, 795 A.2d 96, 102 (Md. 2002) (quoting *Richmond Corp. v. Bd. of County Comm'rs for Prince George's County*, 255 A.2d 398, 404 (Md. 1969)); *see also Feldstein v. LaVale Zoning Bd.*, 227 A.2d 731, 734 (Md. 1967).

As of the morning of April 15, the Clinic had satisfied both requirements for a vested property right under Maryland law. First, by that date, the Clinic had "obtain[ed] a permit . . . [as] required by the applicable [zoning] ordinance." *See Powell*, 795 A.2d at 102. Indeed, in the district court, the County's lawyers conceded that the Clinic had a permit and "a property right," but argued that the County could legally divest the Clinic of that permit and thus of its property interest. *See* Joint Appendix 1778 (agreeing with the district court that the Clinic had a property interest in the zoning permit).

Moreover, as of April 15, the Clinic had also met the second requirement for a vested right under Maryland law — that the permit

be "exercise[d] . . . on the land involved so that the [surrounding] neighborhood" is advised of the use. *Powell*, 795 A.2d at 102; *see also Feldstein*, 227 A.2d at 734. The record contains abundant, uncontroverted evidence that the surrounding neighborhood had been advised of the proposed use. The Clinic's open house for neighbors, the public meetings and letter writing, the newspaper coverage, and the demonstrations all amply attest to this. In fact, the County does not even contend that the "surrounding neighborhood" had not been advised of the proposed use.[8]

According to the County, however, the district court erred in instructing the jury that the Clinic had a vested property interest in its continued operation at the Slade Avenue site because "under Maryland law, a person has no vested rights in a permit that is the subject of continuing litigation." The County accurately quotes this principle. *See Powell*, 795 A.2d at 101; *Antwerpen v. Baltimore County*, 877 A.2d 1166, 1175 (Md. Ct. Spec. App. 2005). But the principle is irrelevant here because the Clinic obtained a valid permit vesting it with property rights on the morning of April 15; neither the issuance of the permit nor the ordinance pursuant to which it was issued is the subject of ongoing litigation. *See Powell*, 795 A.2d at 103. Rather, this litigation concerns the County's attempt to change the zoning ordinance to preclude the Clinic from operating. *See id.* at 102, 103. The very cases on which the County relies make clear that the ongoing litigation rule means only that a person has no vested property right in a permit that has *not yet been issued* and is the subject of ongoing litigation. *See id.* at 105; *Antwerpen*, 877 A.2d at 1171-75.[9] The County's arguments

---

[8]Tellingly, when assisting Councilman Kamenetz in drafting the Bill, the County Council's Legislative Counsel/Secretary warned him in writing on March 27, 2002, that "[t]he Law Office is still concerned about the vesting issue, particularly with regard to the facility that does not require a use and occupancy permit and has already . . . held an 'open house' for the community."

[9]Somewhat mystifyingly, the County heavily relies on *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188 (2003). In *Buckeye*, however, the Court expressly did "*not* decide whether [the permit applicant] possessed a property interest in the building permits" which had *not yet issued* prior to litigation. *Id.* at 198 (emphasis added). Nothing in *Buckeye* supports the County's view that the Clinic lacked a property interest in its zoning permit, which *had been validly issued* prior to any litigation.

that the present litigation defeats the Clinic's property interest in its permit are thus meritless. The undisputed trial evidence demonstrates that under applicable state law the Clinic had a property interest in continued operation at its Slade Avenue location; the district court did not err in so instructing the jury.

2.

The County also argues that the district court erred when instructing the jury on the standard for establishing a substantive due process claim.

The district court instructed the jury:

> Now deprivation of a property interest violates a plaintiff's due process rights if it was clearly arbitrary and unreasonable, with no substantial relationship to a legitimate governmental purpose.

The County argues that the district court should have instructed the jury:

> [A] claim can survive only if the alleged purpose behind the state action has no conceivable rational relationship to the exercise of the state's traditional police power through zoning.

The formulation provided the jury by the district court is nearly identical to the language that the Supreme Court used in the seminal case of *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926). The Court there held that municipal zoning ordinances survive substantive due process challenges unless they are "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *Id.* Two years later, the Court repeated this formulation in holding that a municipal zoning ordinance that "[did] *not* bear a substantial relation to the public health, safety, morals, or general welfare" could not be sustained under the Fourteenth Amendment. *Nectow v. City of Cambridge*, 277 U.S. 183, 188-89 (1928)(emphasis added).

Moreover, in a more recent case the Court has reiterated this precise formulation with approval. *See Moore v. City of E. Cleveland*, 431 U.S. 494, 498 & n.6 (1977) (quoting this language and describing *Euclid* as "this Court's leading land-use case"). Indeed, as recently as 2005, just a year before the district court instructed the jury in this case, the Supreme Court quoted this exact language from *Euclid* and *Nectow* and described these two cases as the Court's "seminal zoning precedents." *See Lingle*, 544 U.S. at 540-41. We too have recently noted that *Euclid* sets forth "the traditional lenient standard for reviewing local zoning decisions under the Due Process . . . Clause[ ]." *AT & T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 426 (4th Cir. 1998); *see also Tri-County Paving*, 281 F.3d at 441 (discussing our precedent holding that government action that is "manifest[ly] arbitrar[y] and unfair[ ]" and "not related to any legitimate [government] interest" creates a substantive due process claim); *Sylvia Dev. Corp.*, 48 F.3d at 827 (quoting *Euclid* and *Nectow*). In light of this controlling precedent, we cannot say that the district court abused its discretion in instructing the jury.

This is not to say that the County's proffered instruction incorrectly states the law. Some cases do articulate the standard for substantive due process using different language than the classic formulation articulated in *Euclid*, and the language the County proffered also has a foundation in our precedent. *See, e.g.*, *Sylvia Dev. Corp.*, 48 F.3d at 827. But a district court does not err by refusing to grant a party's requested jury instruction, even if it is a proper statement of the law, when, as here, the requested instruction was covered by the charge the court gave to the jury. *See United States v. Lewis*, 53 F.3d 29, 32-33 (4th Cir. 1995) (collecting cases).[10]

---

[10]The County also contends that the district court erred when it instructed the jury that:

> Indications that a governmental body's action is arbitrary, unreasonable and not substantially related to a legitimate governmental interest include, but are not limited to, one, the action is tainted with fundamental procedural irregularity. Two, the action is targeted at a single party. Three, the action deviates from or is inconsistent with the defendant's regular practice.

These are precisely the factors that we considered in holding that a substantive due process claim existed in *Scott*, 716 F.2d at 1419-21; the district court did not err in instructing the jury to consider them here.

In sum, we find no grounds on which to disturb the jury's verdict on the Clinic's due process claim. The County failed to preserve its challenge to the sufficiency of the evidence by neglecting to file a Rule 50(b) motion, and the district court did not abuse its discretion in instructing the jury; therefore, we must uphold the jury's verdict that the County denied the Clinic due process of law.

IV.

To recapitulate, we hold that the Clinic had standing to assert its ADA claims, but the district court erred in holding, as a matter of law, that the Clinic had established that its clients were "regarded as" disabled. For this reason, we reverse the judgment to the Clinic and Doe plaintiffs on both ADA claims and remand for a new trial, should the Clinic or the Doe plaintiffs choose to continue to pursue these claims. We affirm the judgment rendered to the Clinic on its substantive due process claim. We therefore vacate the award of declaratory relief under the ADA and affirm the award of declaratory relief under the Due Process Clause.

The district court enjoined the County from discriminating against the Clinic on the basis of its patients' disabilities, from enforcing Bill 39-02 against the Clinic, and from enforcing the Bill against any existing or future methadone treatment centers in Baltimore County. We vacate the injunction. In so far as the injunction rests on the now-reversed ADA judgments, it can no longer stand. We recognize that the award of judgment to the Clinic on the due process claim, which we have affirmed, may provide the basis for a portion of the injunctive relief granted. We must vacate the entire injunction, however, because it is unclear whether the district court in fact based any portion of the injunction on this ground. *See* Fed. R. Civ. P. 65(d); *Alberti v. Cruise*, 383 F.2d 268, 272 (4th Cir. 1967). On remand, the court will have to determine the appropriate injunctive relief on the basis of the due process claim alone.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED IN PART, AND REMANDED*