# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DARIO SUAREZ-VALENZUELA,

*Petitioner,*

v.

ERIC H. HOLDER, JR., Attorney
General,

*Respondent.*

No. 12-1019

On Petition for Review of an
Order of the Board of Immigration Appeals.

Argued: January 29, 2013

Decided: April 24, 2013

Before NIEMEYER, DUNCAN, and FLOYD,
Circuit Judges.

Petition denied by published opinion. Judge Floyd wrote the
opinion, in which Judge Niemeyer and Judge Duncan joined.

## COUNSEL

**ARGUED:** Jesse Reuben Heath, Peter Andres, BAKER &
MCKENZIE, LLP, Washington, D.C., for Petitioner. Derek
C. Julius, UNITED STATES DEPARTMENT OF JUSTICE,
Washington, D.C., for Respondent. **ON BRIEF:** David J.
Laing, BAKER & MCKENZIE, LLP, Washington, D.C., for

Petitioner. Stuart F. Delery, Acting Assistant Attorney General, Civil Division, Douglas E. Ginsburg, Assistant Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

## OPINION

FLOYD, Circuit Judge:

Petitioner Dario Suarez-Valenzuela is a citizen of Peru who entered the United States without inspection in 1999. After Suarez-Valenzuela was convicted of petit larceny, the government issued an Administrative Order of Removal. Suarez-Valenzuela was able to apply for protection under the Convention Against Torture (CAT) because he expressed a fear that Peruvian government officials would torture him if he returned to Peru. An immigration judge granted Suarez-Valenzuela's application for withholding of removal to Peru, but the Board of Immigration Appeals (BIA) reversed. Suarez-Valenzuela appealed, contending that the BIA applied the wrong standard when evaluating his case and that its conclusions were not supported by substantial evidence. We now deny Suarez-Valenzuela's petition.

I.

A.

In 1997, Suarez-Valenzuela appeared on a Peruvian talk show called the "Lara Bazzo Show" after being recruited by the show's investigator, Jason. Although Suarez-Valenzuela was promised items in exchange for his appearance, he never received them. Suarez-Valenzuela complained to Jason, who spoke with Bazzo. When Bazzo refused to provide the items, Suarez-Valenzuela and Jason threatened to report her to a rival television station.

After Suarez-Valenzuela and Jason threatened Bazzo, four men in a white van approached them to intimidate Jason. Each of the men possessed weapons and badges identifying himself as a police officer. Suarez-Valenzuela recognized one of the men as Luis, a police officer who allegedly worked for Bazzo. The men began arguing with Suarez-Valenzuela and Jason, and Luis hit Jason with his gun. Jason fell, injured his head, and died moments later. Luis then shot Suarez-Valenzuela in the foot.

Following the altercation, Suarez-Valenzuela was taken to the hospital and remained there for nearly two weeks. Police officers visited him at the hospital and offered him money in exchange for his silence regarding the circumstances of the shooting. Suarez-Valenzuela refused to accept their offer and told the authorities that Luis killed Jason.

The police asked Suarez-Valenzuela to testify at Luis's trial for Jason's murder, and Suarez-Valenzuela agreed. Several months before the trial, Luis stabbed Suarez-Valenzuela in the chest to prevent him from testifying. Nevertheless, Suarez-Valenzuela ultimately testified against Luis, who was convicted and sentenced to fifteen years of imprisonment, although he served only three months of that sentence. Suarez-Valenzuela testified that he does not know whether Luis remained employed as a police officer following his conviction.

After his release, Luis went to Suarez-Valenzuela's mother's house in an attempt to find Suarez-Valenzuela. Luis allegedly "destroyed" the house. Suarez-Valenzuela initially went to live with his grandmother in order to avoid Luis. Although Luis did not confront Suarez-Valenzuela at his grandmother's house, Suarez-Valenzuela continues to fear for his safety because he believes that the police can use a national identity database to locate him anywhere in Peru. Suarez-Valenzuela left Peru for the United States in 1998 and illegally entered the United States in January 1999.

Following Suarez-Valenzuela's departure from Peru, Luis visited Suarez-Valenzuela's mother's house several times with another individual and threatened to kill Suarez-Valenzuela. Suarez-Valenzuela explained that he was unaware whether the other individual was a police officer. Luis visited the house for the last time in 2008. Luis made the same threats to Suarez-Valenzuela's father in 1999.

B.

On February 17, 2010, Suarez-Valenzuela was convicted of misdemeanor petit larceny. The Department of Homeland Security (DHS) subsequently issued an Administrative Order of Removal based on Suarez-Valenzuela's conviction and his immigration status. Because Suarez-Valenzuela expressed a fear of returning to Peru, DHS stayed his removal and conducted a "reasonable fear interview." The DHS asylum officer who conducted the interview concluded that Suarez-Valenzuela had demonstrated a reasonable fear of torture.

Suarez-Valenzuela's case was referred to an immigration judge. The immigration judge found Suarez-Valenzuela credible and determined that he was subjected to torture when he was shot, stabbed, and threatened. The immigration judge also noted that, according to the State Department's Country Reports on Human Rights Practices for Peru, the police regularly threaten victims and witnesses of human rights abuses, and the perpetrators of those abuses are rarely punished. Although the immigration judge recognized that security forces have developed human rights training, implementation has been slow and security forces are reluctant to provide information about human rights abuses. The immigration judge also found that it was not feasible for Suarez-Valenzuela to relocate within Peru due to the country's national identity database, which would allow the individuals who tortured him to determine his whereabouts. In light of this information, the immigration judge found that it was more likely than not that government officials would torture

Suarez-Valenzuela or acquiesce to his torture if he returned to Peru. The judge therefore granted Suarez-Valenzuela's application for withholding of removal to Peru under the CAT.

DHS appealed the immigration judge's order granting Suarez-Valenzuela's application. On December 6, 2011, the BIA sustained the appeal and vacated the immigration judge's order. The BIA found that the Peruvian government's attempts to mitigate corruption had created an environment that was not conducive to officials' acquiescence to or participation in torture. The BIA also noted that Suarez-Valenzuela had not established that Luis remained employed as a police officer. Finally, the BIA held that there was no indication that government officials have used or will use the national identity database to locate and torture witnesses. The government has since removed Suarez-Valenzuela to Peru.

Suarez-Valenzuela filed a timely petition for review. On appeal, Suarez-Valenzuela contends that the BIA applied the wrong standard when evaluating his case and that substantial evidence did not support its conclusions. We have jurisdiction pursuant to 8 U.S.C. § 1252 and 28 U.S.C. § 2349(a).

## II.

To qualify for protection under the CAT, an applicant bears the burden of showing that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). In relevant part, the CAT's implementing regulations define "torture" as

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as . . . punishing him or her for an act he or she or a third person has committed or is suspected of having committed[ ] or intimidating or coercing him or her or a third person . . . when such pain or suffering is inflicted by or at the instiga-

tion of or with the consent or acquiescence of a pub-
lic official or other person acting in an official
capacity.

*Id.* § 1208.18(a)(1). A public official acquiesces to torture
when, "prior to the activity constituting torture, [he or she]
ha[s] awareness of such activity and thereafter breach[es] his
or her legal responsibility to intervene to prevent such activ-
ity." *Id.* § 1208.18(a)(7). Although evidence of past torture is
relevant, it does not create a presumption that an applicant
will be tortured in the future. *See Niang v. Gonzalez*, 422 F.3d
1187, 1202 (10th Cir. 2005). Instead, immigration judges
should consider evidence of past torture, evidence of "gross,
flagrant or mass violations of human rights," the country's
conditions, and whether the applicant could relocate to a part
of the country where he or she is unlikely to be tortured. 8
C.F.R. § 1208.16(c)(3).

This Court reviews decisions to deny CAT relief for sub-
stantial evidence. *See Dankam v. Gonzalez*, 495 F.3d 113, 124
(4th Cir. 2007). Under this standard, "administrative findings
of fact are conclusive unless any reasonable adjudicator
would be compelled to conclude to the contrary." 8 U.S.C.
§ 1252(b)(4)(B). We will reverse the BIA's decision only if
"the evidence . . . presented was so compelling that no reason-
able factfinder could fail to find the requisite fear of persecu-
tion." *INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *see
also Rusu v. INS*, 296 F.3d 316, 325 n.14 (4th Cir. 2002).

III.

We turn first to Suarez-Valenzuela's argument that the BIA
applied the wrong standard when determining whether gov-
ernment officials would acquiesce to his torture. "A court of
appeals 'is not generally empowered to conduct a *de novo*
inquiry into the matter being reviewed and to reach its own
conclusions based on such an inquiry.' Rather, 'the proper
course, except in rare circumstances, is to remand to the

agency for additional investigation or explanation.'" *INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002) (per curiam) (citation omitted) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)) (pointing to BIA decisions as a prime example of cases for which remand is appropriate). Accordingly, if the BIA utilized the incorrect standard, we should remand the case to allow the BIA to correct its error.

Suarez-Valenzuela contends that the BIA incorrectly utilized the "willful acceptance" standard rather than the "willful blindness" standard. Under the willful acceptance standard, an applicant must demonstrate that government officials had actual knowledge of his or her torture to satisfy the CAT's acquiescence requirement. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1194 (9th Cir. 2003) (distinguishing willful acceptance from willful blindness). By contrast, pursuant to the willful blindness standard, government officials acquiesce to torture when they have actual knowledge of or "turn a blind eye to torture." *See id.* at 1196 (quoting *Ontunez-Tursios v. Ashcroft*, 303 F.3d 341, 355 (5th Cir. 2002)) (internal quotation marks omitted). Several courts—including this Court—have discredited the willful acceptance standard, with many noting that it does not reflect Congress's intent in enacting the CAT. *See Hakim v. Holder*, 628 F.3d 151, 156-57 (5th Cir. 2010); *Silva-Rengifo v. Att'y Gen.*, 473 F.3d 58, 65 (3d Cir. 2007); *Amir v. Gonzales*, 467 F.3d 921, 927 (6th Cir. 2006); *Lopez-Soto v. Ashcroft*, 383 F.3d 228, 240-41 (4th Cir. 2004), *rehearing en banc granted*, (Jan. 13, 2005), *review withdrawn pursuant to settlement*, (July 26, 2005); *Khouzam v. Ashcroft*, 361 F.3d 161, 170-71 (2d Cir. 2004); *Zheng*, 332 F.3d at 1194-96. For example, as the Ninth Circuit explained in *Zheng v. Ashcroft*,

> the Senate ratified a version of the Convention that eliminated an understanding that acquiescence required a public official's *knowledge* and replaced it with an understanding that acquiescence required only a public official's *awareness*. The Senate Committee on Foreign Relations expressly stated that the

purpose of requiring awareness, and not knowledge, "is to make it clear that both actual knowledge and 'willful blindness' fall within the definition of the term 'acquiescence.'"

332 F.3d at 1195 (quoting Comm. on Foreign Relations, Convention Against Torture & Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Exec. Rep. 101-30, at 9 (1990)). We now reiterate this Court's earlier holding that willful blindness can satisfy the acquiescence component of 8 C.F.R. § 1208.18(a)(1).

To support his argument that the BIA wrongly applied the willful acceptance standard rather than the willful blindness standard, Suarez-Valenzuela emphasizes the BIA's citation to *In re S-V-*, 22 I. & N. Dec. 1306 (2000). The BIA parenthetically summarized *In re S-V-*'s holding as "finding the applicant must do more than show that the officials are aware of the activity constituting torture but are powerless to stop it, and must demonstrate that officials are willfully accepting of the tortuous activities." This summary is consistent with the willful acceptance standard, and other courts have recognized that *In re S-V-* espouses the willful acceptance standard and have rejected it for that reason. *See Hakim*, 628 F.3d at 155-57; *McIntosh v. Clement*, 247 F. App'x 226, 227-28 (2d Cir. 2007); *Valdiviezo-Galdamez v. Att'y Gen.*, 502 F.3d 285, 293 (3d Cir. 2007); *Amir*, 467 F.3d at 927; *Ochoa v. Gonzales*, 406 F.3d 1166, 1172 (9th Cir. 2005). Rather than citing *In re S-V-* for the willful acceptance standard itself, however, the BIA cited it for the proposition that "[v]iolence committed by individuals over whom the government has no reasonable control does not fall within the purview of the [CAT]." Nevertheless, as Suarez-Valenzuela notes, the rule for which the BIA cites *In re S-V-* is arguably related to the willful acceptance standard. *See Silva-Rengifo*, 473 F.3d at 65 (linking the willful acceptance standard to the "government's 'ability to control' persons or groups engaging in torturous activity").

Consequently, our next task is to determine whether the BIA actually applied the willful acceptance standard.

In reaching its conclusion that the government would not more likely than not acquiesce to Suarez-Valenzuela's torture upon his return to Peru, the BIA applied the factors outlined at 8 C.F.R. § 1208.16(c)(3). First, the BIA considered "[e]vidence of gross, flagrant or mass violations of human rights within the country of removal" and "[o]ther relevant information regarding conditions in the country of removal" when it evaluated the State Department's Country Reports on Human Rights Practices for Peru. *Id.* § 1208.16(c)(3)(iii)-(iv). Second, the BIA looked at "[e]vidence of past torture inflicted upon the applicant." *Id.* § 1208.16(c)(3)(i). Specifically, the BIA evaluated the past conduct of Luis and his accomplices, noting that the Peruvian government "prosecuted, convicted, and incarcerated [Luis] for his crime." Finally, the BIA considered "[e]vidence that the applicant could relocate to a part of the country of removal where he . . . is not likely to be tortured," *Id.* § 1208.16(c)(3)(ii), paying special attention to whether government officials had used the national identity database to locate and torture Peruvian citizens.

Throughout this analysis, the BIA did not impose any kind of actual knowledge requirement, indicating that its reasoning was not consistent with the willful acceptance standard. Instead, the BIA evaluated whether Suarez-Valenzuela's attacker was likely to repeat his behavior and whether the government was likely to turn a blind eye to Suarez-Valenzuela's torture in light of its response to Luis's earlier conduct and the current country conditions. The BIA's decision therefore conforms to the willful blindness standard, and we need not remand the case to allow the BIA to correct its analysis.

## IV.

We turn next to Suarez-Valenzuela's argument that the BIA's decision to deny CAT protection was not supported by

substantial evidence. As explained above, the BIA relied on three key points when vacating the immigration judge's decision: (1) country conditions and human rights violations in Peru, as evinced by the State Department's country report; (2) evidence of Suarez-Valenzuela's past torture; and (3) whether Suarez-Valenzuela could safely relocate within Peru. For the reasons outlined below, we hold that substantial evidence supports the BIA's conclusions.

The BIA first determined that the country conditions in Peru had improved since Suarez-Valenzuela left the country in 1998. In particular, the BIA noted that the government leadership had changed and that the government had "attempt[ed] to cull corrupt individuals in positions of authority." Although the BIA acknowledged that "the results might not become effective instantaneously," it emphasized that "Peru has taken proactive steps to eradicate corruption." In light of these facts, the BIA concluded that "the applicant did not demonstrate that the current government officials, acting in their official capacity, will acquiesce or consent to his torture."

Suarez-Valenzuela argues that the BIA's analysis of the country conditions is inadequate for two reasons. First, he asserts that the Peru Human Rights Commission's (COMISEDH) report takes a much less favorable view of Peru's treatment of torture victims than the State Department report does and that the BIA should have taken the COMISEDH report into account. Second, he argues that the BIA inappropriately cited *Amilcar-Orellana v. Mukasey*, 551 F.3d 86 (1st Cir. 2008), for the proposition that government officials were unlikely to acquiesce to his torture because Peru had acted to eliminate corruption. Suarez-Valenzuela contends that *Amilcar-Orellana* is inapplicable in this case because it dealt with the Salvadoran government's attempt to ameliorate gang violence rather than its handling of corrupt officials such as Luis. However, we do not find these counterarguments "so compelling that no reasonable factfinder could fail to find the

requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483-84. Furthermore, this Court has previously noted that State Department reports are "highly probative evidence" of conditions in foreign countries. *See Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999). We therefore conclude that the BIA did not err in utilizing the State Department report as a basis for concluding that Peruvian government officials are unlikely to acquiesce to Suarez-Valenzuela's torture.

The BIA next considered evidence of Suarez-Valenzuela's past torture and whether that torture was likely to reoccur. The BIA noted that Suarez-Valenzuela had not established that the government acquiesced to Luis's behavior in the past or would do so in the future. Although the BIA acknowledged that the other officers who assisted Luis "may have acquiesced to the harm the applicant received by not intervening," the BIA considered these officers to be "rogue" because other government officials denounced Luis's behavior by prosecuting, convicting, and incarcerating him.[1] In fact, the BIA noted that Luis tortured Suarez-Valenzuela to prevent him from testifying, indicating that he acted out of fear that the government would punish him and not with any form of government approval. Finally, the BIA explained that Suarez-Valenzuela had not established that Luis's future actions, if any, would be on behalf of the government, noting that Suarez-Valenzuela had not demonstrated that Luis remained a government

---

[1]In addition to arguing that substantial evidence does not support the BIA's decision, Suarez-Valenzuela contends that we should find that the BIA abused its discretion because it failed to give a reasoned explanation for its finding that Luis and his accomplices were "rogue officers" who did not act in an official capacity. Although we recognize that "[t]he BIA may be held to have abused its discretion if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim," *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011), the BIA offered a reasoned explanation that took into account Suarez-Valenzula's testimony regarding the behavior of Luis and his cohorts. We therefore decline to hold that the BIA abused its discretion in determining that Luis and his accomplices were "rogue officers."

employee following his imprisonment. Because Suarez-Valenzuela's testimony supports the BIA's conclusions, we find that substantial evidence supports its determination that the Peruvian government was not complicit in Suarez-Valenzuela's past torture and was unlikely to acquiesce to his future torture.

Finally, the BIA considered whether Suarez-Valenzuela could safely relocate within Peru in light of the country's national identity database. The BIA noted that, in support of his argument that government officials would use the national identity database to locate and torture him, Suarez-Valenzuela relied only on two Internet articles that explained how Peruvian authorities had used the database to track down criminals in the past. The BIA concluded that Suarez-Valenzuela had not proven that the government would provide information from the database to Luis and that "[t]here is no evidence that Peru's national identity database has been used as the applicant suggests." Suarez-Valenzuela does not challenge these findings in his opening brief, although he raises the issue of relocation in his reply brief.

Pursuant to Rule 28 of the Federal Rules of Appellate Procedure, "the argument [section of the brief] . . . must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(9). This Court has held that "[f]ailure to comply with the specific dictates of [Rule 28] with respect to a particular claim triggers abandonment of that claim on appeal." *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). In *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356 (4th Cir. 2008), this Court noted that "[i]t is a well settled rule that contentions not raised in the argument section of the *opening brief* are abandoned." *Id.* at 369 (quoting *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004)). An appellant cannot remedy the situation by raising the issue in his reply brief. *See Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir. 2001) (per

curiam). Although "in rare circumstances, appellate courts, in their discretion, may overlook [the rule that appellants abandon arguments that they do not raise in their opening briefs] and others like it if they determine that a 'miscarriage of justice' would otherwise result," *A Helping Hand*, 515 F.3d at 369 (quoting *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 421 (4th Cir. 2005)), Suarez-Valenzuela "has not even explained why [he] failed to raise th[is] argument[ ] earlier, let alone why, absent our consideration, a miscarriage of justice would result," *id.* (holding that the appellant had failed to overcome the rule regarding abandonment for this reason). Consequently, by neglecting to challenge the BIA's findings regarding relocation in his opening brief, Suarez-Valenzuela waived this argument.[2]

In the CAT context, applicants bear the burden of presenting evidence to show that relocation within the country of removal is not possible. *See* 8 C.F.R. § 1208.16(c)(2)-(3); *Hasan v. Ashcroft*, 380 F.3d 1114, 1123 (9th Cir. 2004). Suarez-Valenzuela has failed to meet this burden. In light of Suarez-Valenzuela's waiver of his relocation argument and our determination that the State Department's country report and the circumstances of Suarez-Valenzuela's past torture support the BIA's findings, we hold that substantial evidence supports the BIA's conclusion that it was not more likely than not that the government would acquiesce to Suarez-Valenzuela's torture upon his return to Peru.

## V.

For the foregoing reasons, we conclude that the BIA uti-

---

[2]Suarez-Valenzuela also argues for the first time in his reply brief that the BIA improperly reviewed the immigration judge's factual findings under a de novo standard of review rather than a clearly erroneous standard. Like Suarez-Valenzuela's relocation challenge, we consider this argument waived because he failed to raise it in his opening brief. We therefore decline to address this argument.

lized the correct standard and that substantial evidence supports the BIA's conclusions in this case. We therefore deny Suarez-Valenzuela's petition for review.

*PETITION DENIED*