**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1226**

ROSA CABRERA VASQUEZ, a/k/a Ruth Calderon Rocha,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: December 12, 2018                    Decided: March 20, 2019

Before GREGORY, Chief Judge, WYNN, and THACKER, Circuit Judges.

Petition for review granted; vacated and remanded by published opinion. Chief Judge Gregory authored the opinion, in which Judge Wynn and Judge Thacker joined.

**ARGUED:** Michael Rosado, LAW OFFICES OF ROSADO & SOTREN, P.C., Beltsville, Maryland, for Petitioner. Alexander Jacob Lutz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, Anthony C. Payne, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

GREGORY, Chief Judge:

Appellant Rosa Cabrera Vasquez ("Cabrera") and her son Brandon were told they would be killed by members of the 18th Street gang if they did not leave their native country of El Salvador within 24 hours. That was the second death threat the mother and son received. When local law enforcement refused to provide any form of aid, Cabrera and Brandon made their journey to the United States. Their application for relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT") was denied. Because the Board of Immigration Appeals ("BIA") failed to fully consider the evidence in support of Cabrera's CAT claim, we grant her petition for review of that claim, vacate the BIA's order with respect to that claim, and remand for further proceedings consistent with this opinion.

I.

A.

Cabrera's family has been the victim of gang violence in El Salvador. In 2010, her 17-year-old nephew was murdered by gang members when he attempted to resist the gang's assault. Four years later, in March 2014, Cabrera's sister-in-law disappeared after being kidnapped by gang members during the night from her home. During the three weeks that Cabrera's sister-in-law was missing, Cabrera and her youngest son Brandon searched for her. When Cabrera's sister-in-law was found, she had been sexually assaulted and beaten severely.

2

In the course of that search, Cabrera and Brandon happened upon a clandestine graveyard used by members of the 18th Street gang. Thereafter, gang members began to threaten Cabrera and her son with death if they told anyone about the graveyard. Cabrera reported the threats to local police but was told that without any proof of the threats, the police could do nothing to help her. So Cabrera took her son and moved. But the gang tracked them down and continued to threaten Cabrera and her son's lives. Gang members sent notes and messages, making it clear that "they didn't want to see [Cabrera] over there, see [Cabrera and Brandon] over there, because they w[ould] kill [them]." A.R. 104. The gang gave Cabrera and her son 24 hours to leave the country.

Cabrera went back to the police, this time with the written notes in hand as evidence. Instead of offering assistance, however, the police "laughed in [her] face" and accused her son of being a gang member himself. *Id.* The police provided one piece of advice: "go back home." *Id.*

When the police offered no help, Cabrera made the "radical decision" to flee El Salvador. *Id.* She and her son initially journeyed to Mexico, but later left Mexico for the United States when family members in Mexico were unable to provide Brandon with adequate "protection." A.R. 94.

B.

Cabrera and Brandon entered the United States without documentation on July 12, 2014, near Naco, Arizona, where they were detained by the Department of Homeland Security ("DHS"). During a credible fear interview, Cabrera expressed fear for her and her son's lives if they were returned to El Salvador.

3

Cabrera was placed into removal proceedings in Arizona. Upon her release from DHS custody, Cabrera moved to Maryland, retained counsel, and moved successfully to change the venue of her removal proceedings to the Baltimore immigration court.

Cabrera conceded removability and applied for asylum, withholding of removal, and protection under the CAT. In her application, she expressed fear that she and her son would "risk torture or even death by the gang 18" if they returned to El Salvador because they had "stumbled upon" the "clandestine cemetery" and "gang members said they would kill us if we told anybody." A.R. 121. At a hearing before the immigration judge ("IJ"), Cabrera testified about the death of her 17-year-old nephew, who "was attacked cruelly" by gang members. A.R. 100. She also described her sister-in-law's disappearance and the threats made to Cabrera and her son after they discovered the clandestine graveyard. When asked about the rest of her family, Cabrera responded that she has two other sons who remain in El Salvador and have not been the subject of gang threats. Cabrera testified, however, that she could not return and live with them because the gang members "are still over there." A.R. 102. Nor could she live with her parents, who were "already elderly." *Id.* In short, Cabrera had nowhere safe in El Salvador to go.

In addition to her testimony, Cabrera submitted documentary evidence to support her CAT claim. That evidence included her nephew's death certificate, the declarations of three friends describing her character and the trouble that she had with the gang, a 2014 Congressional Research Service ("CRS") report on gangs in Central America, a 2016 CRS background report on El Salvador, and several news articles discussing the widespread violence in the country.

4

After considering Cabrera's testimony and the documentary evidence, the IJ denied Cabrera's application for relief. As relevant to this appeal, the IJ found Cabrera's testimony credible and consistent with the documentary evidence presented but held that she had not met her burden with respect to her CAT claim. According to the IJ, the gang's death threats, "while unfortunate," failed to rise to the level of torture. A.R. 61. The IJ also determined that Cabrera provided no evidence that she would more likely than not be subjected to torture if she returned to her home country. This was because Cabrera's older sons still live in El Salvador and have not been threatened or harassed themselves.

The IJ additionally found that Cabrera had not established that the torture she feared would come at the hands, or at the acquiescence, of government officials. As the IJ explained, "[t]hough certainly concerning, the fact that the police informed [Cabrera] that there was insufficient information to file a report fails to demonstrate that government officials are willfully accepting of the actions by gang members." A.R. 61. Addressing the documentary evidence Cabrera submitted, the IJ noted that the widespread problems appeared "to flow from a weak central government, as opposed to a conscious effort by the government to leave populations vulnerable." A.R. 61–62. That, coupled with the fact that the country conditions report indicated efforts by the government to fight the gangs, persuaded the IJ that there was insufficient evidence that the Salvadoran government "would bear any responsibility—through direct or passive acquiescence—for physical harm visited upon [Cabrera]." A.R. 62 (quoting *Matter of Y.L., A.G., R.S.R.*, 23 I&N Dec. 270, 281 (BIA 2002)).

Cabrera filed a timely appeal with the BIA. The BIA affirmed the denial of Cabrera's CAT claim, agreeing with the IJ that Cabrera had not established eligibility for protection. In its one paragraph of analysis, the BIA found that the IJ's conclusion that country conditions showed the government was making efforts to fight the gangs—therefore making the government unlikely to acquiesce to torture—was not clearly erroneous. The BIA did not address the conduct of the police officers. Nor did the BIA comment on the IJ's finding that there was no evidence of torture.

Cabrera timely petitioned this Court for review.

II.

An applicant seeking protection under the CAT bears the burden of showing "it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.* § 1208.18(a)(1). A public official acquiesces to torture if that official is aware of the activity constituting torture prior to the activity and breaches his or her "legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7); *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013). Officials "need not have actual knowledge of the torture; it is enough if they simply 'turn a blind eye' to it." *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014) (citing *Suarez-Valenzuela*, 714 F.3d at 245–47).

6

While evidence of past torture is relevant, it does not create a presumption of future torture. *Suarez-Valenzuela*, 714 F.3d at 245. Instead, the IJ should consider: (1) evidence of past torture; (2) whether the applicant could safely relocate to another part of the country; (3) evidence of "gross, flagrant or mass violations of human rights within the country of removal"; and (4) other relevant information of country conditions. 8 C.F.R. § 1208.16(c)(3).

When CAT relief is denied, we review the underlying factual findings for substantial evidence. *Suarez-Valenzuela*, 714 F.3d at 245; *Turkson v. Holder*, 667 F.3d 523, 527–29 (4th Cir. 2012). Under this standard, "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Suarez-Valenzuela*, 714 F.3d at 245 (quoting 8 U.S.C. § 1252(b)(4)(B)). While this is a deferential standard, we will reverse the BIA's decision if the evidence presented "was so compelling that no reasonable factfinder could fail to find" the requisite likelihood of being tortured at the government's acquiescence upon return to the applicant's country of origin. *Suarez-Valenzuela*, 714 F.3d at 245 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992)).

We also review the BIA's decision for abuse of discretion. *Rodriguez-Arias v. Sessions*, ___ F.3d ___, ___, No. 17-2211, 2019 WL 542996, at *3 (4th Cir. Feb. 12, 2019); *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). We may find that the BIA abused its discretion "if it failed to offer a reasoned explanation for its decision, or if it distorted or disregarded important aspects of the applicant's claim." *Tassi*, 660 F.3d at 719. Where, as here, the BIA did not adopt the IJ's opinion but instead offered its own

reasons for denying relief, we review the BIA's order rather than the IJ's decision. *Tairou v. Whitaker*, 909 F.3d 702, 706 (4th Cir. 2018) (citing *Ngarurih v. Ashcroft*, 371 F.3d 182, 188 (4th Cir. 2004)).[1]

## III.

Cabrera argues that the BIA erred in concluding that the evidence does not demonstrate that Salvadoran officials would likely acquiesce in Cabrera's torture if she were returned to El Salvador. This conclusion, Cabrera contends, is improperly based on a limited analysis of the country conditions that fails to consider Cabrera's credible testimony. We agree.

Those who arrive at our border fleeing torture and seeking refuge under our laws "have the right to know that the evidence they present of mistreatment in their home country will be fairly considered and weighed by those who decide their fate." *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009). Therefore, in reviewing the BIA's final order, we have a "responsibility to ensure that unrebutted, legally significant evidence is

---

[1] The parties express some disagreement as to which decision below, and what parts of those decisions, we should review. Cabrera's brief suggests that we should review the entirety of both decisions; the Government asserts that only the BIA and IJ's discussion of acquiescence by public officials is reviewable. "[W]here the BIA issues an opinion without adopting the IJ's opinion in whole or in part, this Court can only review the BIA's opinion." *Martinez v. Holder*, 740 F.3d 902, 908 n.1 (4th Cir. 2014). Rather than adopt the IJ's reasoning, the BIA has apparently conducted an independent review of the IJ's findings and has limited its reasoning to Cabrera's failure to demonstrate that any torture would be at the acquiescence of the Salvadoran authorities. Therefore, we review only the BIA's decision. *See Tairou*, 909 F.3d at 706; *Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005).

8

not arbitrarily ignored by the factfinder." *Id.* As we have made clear, "[i]t is an abuse of discretion for the BIA or IJ to arbitrarily ignore relevant evidence." *Rodriguez-Arias*, 2019 WL 542996, at \*5; *Baharon*, 588 F.3d at 233; *Tassi*, 660 F.3d at 719. And while our job is not to reweigh the evidence that was before the IJ, *Baharon*, 588 F.3d at 233, the BIA's "failure to engage with an applicant's evidence hampers our ability to meaningfully review what was decided below," *Rodriguez-Arias*, 2019 WL 542996, at \*5 (citing *Zelaya v. Holder*, 668 F.3d 159, 168 (4th Cir. 2012)).

Here, the BIA erred by limiting its review of Cabrera's evidence of government acquiescence to the country condition reports that "showed the government was making efforts to fight the gangs in El Salvador." A.R. 4. The BIA entirely failed to address Cabrera's testimony that she twice sought the aid of local police and twice was turned away. While the police initially refused to assist her because of a lack of evidence, when she did present evidence of the death threats she and her son received, she was laughed at and her son was accused of being a gang member himself. This testimony is material to Cabrera's claim that Salvadoran officials turned a "blind eye" to the death threats. *Mulyani*, 771 F.3d at 200; 8 C.F.R. § 1208.16(c)(2) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").[2]

---

[2] We note that the IJ appears to have applied the wrong standard in determining whether Cabrera's evidence demonstrated that public officials would acquiesce in her torture if she returned to El Salvador. The IJ concluded that Cabrera's encounters with the police "fail[ ] to demonstrate that government officials are willfully accepting of the actions of the gang members." A.R. 61. A CAT applicant, however, is not required to demonstrate a "willful acceptance" of torture by public officials. Rather, we have held that public officials "need not have actual knowledge of the torture; it is enough if they (Continued)

Although the IJ found Cabrera's testimony credible, the BIA's order lacks any meaningful engagement with her testimony. Such a "wholesale failure to fully consider" the country conditions evidence Cabrera presented to show government acquiescence in her torture constitutes reversible error. *Rodriguez-Arias*, 2019 WL 542996, at *6; *Zelaya*, 668 F.3d at 168.[3]

IV.

For the foregoing reasons, we grant Cabrera's petition for review of her CAT claim, vacate the BIA's decision with respect to that claim, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED; VACATED AND REMANDED*

---

simply 'turn a blind eye' to it." *Mulyani*, 771 F.3d at 200 (citing *Suarez-Valenzuela*, 714 F.3d at 245–47).

[3] The BIA affirmed only on the ground that Cabrera failed to demonstrate government acquiescence in any torture. The agency did not consider whether the death threats constituted torture under the CAT. We note that the IJ summarily concluded, without analysis, that "[t]he threats and harassment the Respondent suffered, while unfortunate, do not rise to the level of torture for purposes of protection under the CAT." A.R. 61. Death threats to one's self or others may constitute torture under the CAT. 8 C.F.R. § 1208.18(a)(4)(iii)-(iv). Upon remand, therefore, we expect that if there is a finding that the threats Cabrera received do not amount to torture, it will be accompanied by meaningful reasoning.