**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1753

JOSE MANUEL VALLE AMAYA,

      Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

      Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Submitted: January 28, 2022                    Decided: March 3, 2022

Before WILKINSON and AGEE, Circuit Judges, and FLOYD, Senior Circuit Judge.

Petition for review denied by unpublished opinion. Judge Wilkinson wrote the opinion, in which Judge Agee and Judge Floyd joined.

**ON BRIEF:** John E. Gallagher, Catonsville, Maryland, for Petitioner. Brian Boynton, Acting Assistant Attorney General, Timothy G. Hayes, Senior Litigation Counsel, Sunah Lee, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

Unpublished opinions are not binding precedent in this circuit.

WILKINSON, Circuit Judge:

Jose Manuel Valle Amaya, a citizen of Honduras, applied for protection under the Convention Against Torture. The Immigration Judge and the Board of Immigration Appeals both denied his application, and Valle now petitions for review. Because substantial evidence supports the decisions below, we deny Valle's petition.

I.

A.

Valle entered the United States unlawfully in 2006. In July 2015, the Department of Homeland Security charged him with removability as a noncitizen present in the United States without being admitted or paroled. *See* 8 U.S.C. § 1182(a)(6)(A)(i). Valle then conceded removability through counsel. To avoid removal, Valle initially applied for asylum, withholding of removal, and protection under the Convention Against Torture (CAT). He later acknowledged that he was only applying for CAT protection.[1]

Valle testified in support of his application at an April 2018 hearing. While in Honduras, Valle worked in construction supervising between fifteen and twenty workers and making a good living. For several years (and until 2004), gang members robbed him once or twice each month while he was walking home from work. Valle reported these robberies to the police, who would come and ask for details about what happened and who the gang members were.

---

[1] In this appeal, Valle likewise only challenges the denial of relief under the CAT.

2

Because Valle oversaw payroll for his team, it was his responsibility to go to the bank and then pay each worker at the construction site. The robberies almost always happened after Valle had already paid the other workers. But on one occasion in 2005, several armed gang members came to a construction site and took the entire payroll. The gang members approached Valle and asked, "Where is Jose Manuel?"—without realizing that they were asking Valle about himself. During this robbery, one of the gang members hit Valle in the face with a pistol. Valle called the police, who came to help but did not arrive until after the gang members had left.

At some point, Valle transferred to work in other Honduran provinces to avoid the gang members. While he was away, gang members would sometimes come to Valle's house, saying that he had "accounts pending" with the gang. A.R. 70. Valle only returned home once a month to see his family, and when he did so he would stay inside to prevent gang members from noticing that he was home. Though Valle wanted to move, he didn't "think about pick[ing] up everything and just mov[ing] to another place" because no one would buy his house and he "had everything already established" in his hometown. A.R. 77. However, in December 2005, gang members came to Valle's house and said that they would kill him unless he paid them 20,000 Lempiras within one week. Almost immediately thereafter, Valle fled Honduras.

Valle left his wife and three children in Honduras. When asked whether his family had problems since he left, Valle said that gang members once threatened to steal his son's shoes but that his family had "never been robbed." A.R. 78. An affidavit from Valle's wife

3

recounted that people who she does not know have visited the house since Valle has left the country, and sometimes those people have hit or pointed guns at her or the children.

While Valle testified that he thought gang members would kill him upon his return to Honduras, he did not point to a specific gang or gang member. Valle also conceded that what happened to him could happen to anyone in Honduras.

B.

Three months after Valle's hearing, the Immigration Judge (IJ) issued a decision denying Valle relief under the CAT. That decision began with a thorough discussion of Valle's testimony, which the IJ found to be credible overall. On Valle's CAT claim, the IJ found that Valle did not meet his burden to establish that he would more likely than not suffer torture with the acquiescence of government officials. As to the likelihood of torture, the IJ noted that Valle's family had lived safely in Honduras since 2005, that Valle only noted one instance of gang members making threats to his family, and that the vague and unsupported assertions of Valle's wife were insufficient. As to acquiescence, the IJ noted that the police "promptly responded and recorded the incidents" that Valle reported and that "vague accusations of police inaction and inadequacy do not show that Honduran authorities would approve or willfully accept the actions of the gang members." A.R. 50. She also recognized the "substantial effort" by the Honduran government to combat gang violence, which indicated that it "does not condone or acquiesce to gang misconduct." A.R. 50.

On appeal, the Board of Immigration Appeals first saw no legal or clear factual error in the IJ's conclusion as to the likelihood of torture. Next, the Board recognized that the

4

acquiescence issue should be analyzed under a willful blindness standard as opposed to one of willful acceptance. Despite the IJ's use of the words "willfully accept," the Board found that her decision did not require actual knowledge and thus "in substance conform[ed] to the 'willful blindness' standard." A.R. 4. Because the IJ considered both general country conditions and specific claims by Valle and correctly found that mere inability to protect does not establish government acquiescence, the Board upheld the IJ's decision.

Valle then timely petitioned this court for review.

II.

The governing law is clear. An applicant seeking CAT protection "must prove, first, that it is more likely than not that he will be tortured if removed to the proposed country of removal and, second, that this torture will occur at the hands of government or with the consent or acquiescence of government." *Martinez v. Holder*, 740 F.3d 902, 913 (4th Cir. 2014) (quoting *Turkson v. Holder*, 667 F.3d 523, 526 (4th Cir. 2012)); *see also* 8 C.F.R. §§ 1208.16(c)(2). Torture is "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person . . . by, or at the instigation of, or with the consent or acquiescence of, a public official . . . or other person acting in an official capacity." *Id.* § 1208.18(a)(1). And acquiescence requires that "the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." *Id.* § 1208.18(a)(7) (2018).

Our standard of review is likewise well-defined. When the Board "affirms the IJ's opinion with an opinion of its own, we review both decisions." *Ortez-Cruz v. Barr*, 951

5

F.3d 190, 197 (4th Cir. 2020) (quoting *Salgado-Sosa v. Sessions*, 882 F.3d 451, 456 (4th Cir. 2018)). Valle's failure to meet his burden on his CAT claim is a factual finding which we review for substantial evidence. *Cabrera Vasquez v. Barr*, 919 F.3d 218, 222 (4th Cir. 2019). That "highly deferential" standard, *Nasrallah v. Barr*, 140 S. Ct. 1683, 1692 (2020), dictates that such "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C. § 1252(b)(4)(B); *see also Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014) ("We uphold factual findings unless no rational factfinder could agree with the [Board's] position."). So we can reverse the Board's decision only if the evidence "was so compelling that no reasonable factfinder could fail to find" the requisite likelihood of torture and government acquiescence. *Suarez-Valenzuela v. Holder*, 714 F.3d 241, 245 (4th Cir. 2013) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483–84 (1992)); *see also* 8 U.S.C. § 1252(b)(4)(D) (denial of relief "shall be conclusive unless manifestly contrary to the law and an abuse of discretion"). The Board's decision "must remain undisturbed" if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016) (quoting *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011)).

We conclude that substantial evidence supports the Board's denial of relief here. Valle did not establish that all reasonable adjudicators must conclude it was more likely than not that he would be tortured if returned to Honduras. Nor does Valle's evidence compel us to conclude that the Honduran government would acquiesce in any such torture. As a result, we deny Valle's petition for review.

A.

First, Valle must prove that any reasonable adjudicator would be compelled to conclude that "it is more likely than not" he "would be tortured if removed" to Honduras. 8 C.F.R. § 1208.16(c)(2); *see* 8 U.S.C. § 1252(b)(4)(B). He cannot do so here.

Valle argues that because he was robbed on a monthly basis for several years and threatened with death, it is more likely than not that he would be tortured if returned to Honduras. As an initial matter, Valle must show that he "will be *tortured*, not merely threatened." *Ortez-Cruz*, 951 F.3d at 202 (emphasis in original). Not every instance of violence amounts to torture. *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 218 (4th Cir. 2020). Under the CAT, torture is "an *extreme* form of cruel and inhuman treatment." 8 C.F.R. § 1208.18(a)(2) (emphasis added). While facing multiple robberies is something no one would wish to endure, reasonable adjudicators could disagree as to whether that amounts to torture under the CAT.

In stark contrast to the CAT's careful definition of torture, Valle's approach lacks almost any limiting principle. When Valle was asked whether what happened to him could happen to any Honduran citizen, he replied, "Of course." A.R. 78. This failure "to establish he would be targeted by gangs more than any other citizens" decreases the likelihood that *he* will be tortured. *See Lizama v. Holder*, 629 F.3d 440, 449 (4th Cir. 2011). If pointing to commonplace violence suffices, then proving torture begins to look more like vaulting a low hurdle rather than clearing the CAT's "high bar." *Amaya-De Sicaran*, 979 F.3d at 218.

Relatedly, evidence of past torture "does not create a presumption that an applicant will be tortured in the future" under the CAT. *Suarez-Valenzuela*, 714 F.3d at 245. Instead,

7

we must consider "all evidence relevant to the possibility of future torture." 8 C.F.R. § 1208.16(c)(3). Several strands of evidence diminish the likelihood of future torture in Valle's case.

First, as the IJ and the Board recognized, Valle's "wife and children have lived safely in Honduras since 2005." A.R. 50. Valle testified that his family "ha[s] never been robbed" since he left, A.R. 78, and he recounted only one instance of a threat (to steal his son's shoes) being issued in over a decade. This evidence decreases the likelihood that Valle will be tortured. *See Ascencio v. Garland*, 2022 WL 112071, at *7 (4th Cir. Jan. 12, 2022) (affirming denial of CAT relief in part because family members remained in El Salvador unharmed).

Second, by the time of Valle's hearing, he had not been harassed by gang members for around thirteen years. This considerable length of time makes it less likely that Valle will be tortured if removed. *See Ortez-Cruz*, 951 F.3d at 203 (suggesting that a fifteen-year gap decreased the likelihood of torture); *Monterroso-Ovalle v. Wilkinson*, 836 F. App'x 186, 187 (4th Cir. 2021) (recognizing that the amount of time since an abuser's last contact with applicant is a relevant factor in a CAT claim).

Third, when Valle was asked who specifically would kill him if he returned to Honduras, he replied, "I have been a target of the gangs." A.R. 78. Valle thus resorted to a vague and amorphous category—"the gangs"—as opposed to a particular group or individual. An inability to point with some level of specificity to *who* will torture him decreases the likelihood that Valle will in fact be tortured. *See Lukunku-Tshibangu v. Lynch*, 652 F. App'x 180, 185 (4th Cir. 2016) (petitioner's failure to "specifically identify"

8

those "who would want to harm him" weighed against his contentions that he was likely to be tortured).

Finally, this likelihood further diminishes when Valle's own testimony established that the gang members who previously robbed him either "never knew" his name or knew his name but "didn't recognize me because they asked myself about me." A.R. 73, 80. If Valle's identity remains unknown to the gang members (and nothing in the record indicates otherwise), it is difficult to conclude that they would torture him upon his return. *See Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014) (lack of evidence that the potential torturer knew applicant's identity was relevant to a CAT claim).

We must also consider "[e]vidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii). CAT applicants like Valle "bear the burden of presenting evidence to show that relocation within the country of removal is not possible." *Suarez-Valenzuela*, 714 F.3d at 249. Here, the record demonstrates that Valle transferred to other provinces for work in response to the robberies. While Valle testified that the gang members would come to his house during this time, he did not suggest that they followed him to those other provinces. And he admitted that it was his own "ignorance," A.R. 77, combined with a desire to avoid uprooting his family, that meant he did not relocate. This further undercuts Valle's arguments about torture: he *could* relocate, even if he didn't want to do so.

Examining the record as a whole, substantial evidence supports the Board's determination on this issue. Valle defines torture in a way that dilutes its seriousness, admits that his family has remained unharmed in Honduras, ignores the substantial passage

9

of time, avoids specifying who will torture him, confesses that the gangs do not know his identity, and discounts the possibility of relocation within Honduras. Reasonable adjudicators thus are not compelled to find it more likely than not that Valle would be tortured if returned to Honduras.

B.

While Valle's failure to demonstrate the requisite likelihood of torture defeats his claim, the IJ and the Board also found that Valle did not establish that the Honduran government would acquiesce in his torture. Valle must therefore prove that the evidence compels all reasonable adjudicators to conclude otherwise. In his attempt to do so, he argues that the IJ both applied an incorrect legal standard and made erroneous factual findings. Valle is wrong on both counts. Yet again, he cannot show that every rational factfinder would disagree with the Board's position. *See Temu*, 740 F.3d at 891.

1.

Valle first claims that in assessing government acquiescence, the IJ used a willful acceptance standard rather than the proper willful blindness standard. Not so. Though the IJ referenced the incorrect standard in passing, she applied the correct standard in substance. We thus have no need to remand to the Board in this instance. *Suarez-Valenzuela*, 714 F.3d at 247.

We have previously noted that willful acceptance requires "actual knowledge" of torture, while willful blindness is a lower bar that can manifest either in actual knowledge or in "turn[ing] a blind eye." *Suarez-Valenzuela*, 714 F.3d at 245. And we have held that willful blindness can satisfy the CAT's acquiescence requirement. *Id.* at 246. Because the

10

IJ mentioned that accusations of police inaction did not show that Honduras would "willfully accept" the gang members' actions, A.R. 50, we must "determine whether [she] actually applied the willful acceptance standard"—that is, whether she required actual knowledge for government acquiescence, *Suarez-Valenzuela*, 714 F.3d at 246.

The Board concluded that she did not; it instead found that "the Immigration Judge's decision in substance conforms to the 'willful blindness' standard." A.R. 4 (citing *Suarez-Valenzuela*, 714 F.3d at 247). We agree. As the Board pointed out, the IJ considered both general country conditions and Valle's specific claims. Nowhere did she explicitly require actual knowledge. And nothing in her analysis implicitly depended on the difference between actual knowledge and turning a blind eye: she focused on actions that pass muster under either standard, such as the police "promptly respond[ing] and record[ing] the incidents" Valle reported and the Honduran government "making a substantial effort" to combat gang violence. A.R. 50. Her "decision therefore conforms to the willful blindness standard." *Suarez-Valenzuela*, 714 F.3d at 247. In such circumstances, "we need not remand the case." *Id.*

2.

Having found no legal error, we turn to the Board's factual findings. We conclude that substantial evidence in the record supports the Board's finding that Valle did not meet his burden of establishing government acquiescence. Evidence both in Valle's specific case and in Honduras generally shows that the government does not condone torture.

Begin with Valle's testimony. He testified that whenever he would call the police to report a robbery, "they would come and say what happened to you, who robbed you."

11

A.R. 72. And after the robbery of the entire payroll, the police "came to help" once they were aware of the gang activity. A.R. 69. The IJ therefore correctly noted that "the local authorities promptly responded and recorded the incidents reported" by Valle. A.R. 50.

In response Valle does not allege that, say, the police laughed in his face, or told him they could not help for fear of gang retaliation, or actively colluded with the gang. *See Cabrera Vasquez*, 919 F.3d at 220 (laughter); *Zelaya v. Holder*, 668 F.3d 159, 167 (4th Cir. 2012) (fear); *Alvarez Lagos v. Barr*, 927 F.3d 236, 256 (4th Cir. 2019) (collusion). Instead, Valle contends that the police were ineffective in investigating the robberies—that they did not apprehend the gang members involved or call him to follow up. But that the police have difficulty solving crimes does not mean that they condone or turn a blind eye to criminal activity. *Amaya-De Sicaran*, 979 F.3d at 219 ("[T]he government's difficulty in eliminating this scourge does not equate to condoning it."); *Andrade-Garcia v. Lynch*, 828 F.3d 829, 836 (9th Cir. 2016) ("[A] general ineffectiveness on the government's part to investigate and prevent crime will not suffice to show acquiescence.").

Even in our own country, the violent-crime clearance rate leaves much to be desired. In 2019, for example, only 30.5% of reported robberies were cleared. *See* Federal Bureau of Investigation, *Crime in the United States, 2019* at 2 (2020), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/clearances.pdf. But this does not indicate that the police condone crime or acquiesce to it. So we likewise decline to disparage the Honduran police simply for failing to solve every crime.

Turn finally to the country conditions in the record. The IJ acknowledged that while "there is room for improvement" when it comes to gang violence and police ineffectiveness

in Honduras, the government "is making a substantial effort" to combat these problems. A.R. 50. Among other things, the Honduran government has enacted a law that punishes gang membership; has deployed its military to help combat gangs; has taken steps to prosecute police officers and other government employees who have abused their authority; and has offered rehabilitation programs for former gang members. *See* A.R. 95, 163–64, 166. Rather than turning a blind eye, Honduras is making an effort to ameliorate the problem.

## III.

All told, Valle failed to establish both that he is more likely than not to be tortured if removed to Honduras and that any such torture would occur with the acquiescence of the Honduran government. Having reviewed the record, we find that substantial evidence supports the Board's denial of CAT relief. We thus deny Valle's petition for review.

*DENIED*